[S. F. No. 8583. In Bank.—March 25, 1918.]

## SOUTHERN PACIFIC COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

WORKMEN'S COMPENSATION ACT—FEDERAL "EMPLOYERS' LIABILITY ACT" —UNITED STATES, COURT DECISIONS.—Upon the question whether a given employment falls within the scope of the Federal "Employers' Liability Act" (35 U. S. Stats. 65), the decisions of the United States courts are of controlling force.

ID.—ELECTRIC RAILWAYS — DEATH OF LINEMAN — CHARACTER OF EMPLOYMENT — INTERSTATE COMMERCE — JURISDICTION OF INDUSTRIAL ACCIDENT COMMISSION.—Where an electric lineman was killed by an

electric shock received while he was engaged in wiping insulators on the main power line of a railway company which operated a system of electric railways, with cars used both in intrastate and interstate commerce, and maintained a main power-house for the generation of electric power, whence it transmitted an alternating current of high voltage through a main power line to substations, where the current was converted by converters and transformers to a direct current of reduced voltage and passed thence to trolley wires, and from them to the motors on the cars, the Industrial Accident Commission had jurisdiction to make an award, since the main power line on which the deceased was working was not part and parcel of the railroad or its equipment, but an instrumentality by means of which something necessary for the operation of the cars was brought to a point where it could be usefully applied, and all that those engaged in keeping the main power line in order did was to assist in putting on the trolley line the necessary power to be used by the operatives of the road as desired.

PROCEEDING in Certiorari to review an award of the Industrial Accident Commission.

The facts are stated in the opinion of the court.

A. L. Clark, and Henley C. Booth, for Petitioner.

Christopher M. Bradley, for Respondent.

SLOSS, J.—The Industrial Accident Commission made an award in favor of the dependents of William T. Butler, who was killed while working as an electric lineman in the employ of petitioner, Southern Pacific Company. Said company operates a system of electric railway lines in Alameda County, its cars being used in both intrastate and interstate commerce. For the generation of electric power the company maintains at Fruitvale a main power-house, whence an alternating current of high voltage is transmitted through a main power line to substations. At the substations the current passes through converters and transformers, which convert it to a direct current and reduce its voltage. The direct current, thus reduced, passes to the trolley wires, and from them to the motors on the cars.

When Butler sustained the fatal injury, which was caused by an electric shock, he was engaged in wiping insulators on the main power line between the Fruitvale power-house and the substations.

This writ of review was issued to test the validity of the employer's claim that the commission was without jurisdiction to make an award, for the reason that Butler was engaged in interstate commerce, within the purview of the act of Congress of April 22, 1908. In its findings the commission, after setting forth in some detail the circumstances surrounding the employee's injury, declares "that while said employee was working as aforesaid between said power-house and said substation, the electricity which caused said electric shock had not reached its point of distribution to said electric cars, and he was employed in work preliminary to the running of said electric cars, and that, therefore, he was not employed in interstate commerce."

Upon the question whether a given employment falls within the scope of the federal act we must look to the decisions of the courts of the United States as of controlling force. In *Shanks* v. *Delaware, L. & W. R. R. Co.,* 239 U. S. 556, [L. R. A. 1916C, 797, 60 L. Ed. 436, 36 Sup. Ct. Rep. 188], the court said: "The true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it?" The commission was, no doubt, seeking to apply this test, and we take it that the word "preliminary," though perhaps not an altogether appropriate term, was used by it in its finding to express the idea that the work in which Butler was engaged was not so closely related to interstate transportation as to be a part of it.

The opinion in the Shanks case refers to a number of earlier cases in which, upon varying facts, the federal statute had been held to be applicable or inapplicable. Upon examination of these decisions, it will be found that each case turned upon the peculiar facts of the employment in question. It may be said, however, that the decisive consideration is always the closeness or remoteness of the particular work, as related to interstate transportation. In this court it has been held that a mechanic engaged in repairing a switch-engine which was used in the transportation of commerce, interstate and intrastate, was engaged in interstate commerce within the meaning of the act (*Southern Pac. Co.* v. *Pillsbury,* 170 Cal. 782, [L. R. A. 1916E, 916, 151 Pac. 277]) ; that a watchman on a main steam line was engaged in interstate commerce

(*Southern Pac. Co.* v. *Industrial Accident Commission,* 174 Cal. 8, [L. R. A. 1917E, 262, 161 Pac. 1139]) ; as was a lineman who was removing a telephone wire which had fallen on the trolley wire of the same lines involved in this proceeding. (*Southern Pac. Co.* v. *Industrial Accident Commission,* 174 Cal. 19, [161 Pac. 1143].)

In *Chicago, B. & Q. R. R. Co.* v. *Harrington,* 241 U. S. 177, [60 L. Ed. 941, 36 Sup. Ct. Rep. 517, 11 N. C. C. A. 992], the supreme court of the United States had occasion to consider a state of facts more closely analogous to the situation here presented. The injured employee was a member of a switching crew which was engaged in switching cars of coal belonging to the railroad company. The coal was being switched to a shed, where it was to be placed in bins and chutes, and supplied as needed to locomotives engaged in interstate as well as intrastate transportation. It was held that the Federal Employers' Liability Act was not applicable. Applying the test laid down in the Shanks case, the court said that ''manifestly there was no such close or direct relation to interstate transportation in the taking of the coal to the coalchutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use.'' The reasoning is apt here. The coal was essential to the production of motive power for the locomotives, just as, in this case, the electric current was necessary to move petitioner's cars. But in moving the coal to the shed, Harrington was engaged in a work which was at least one step removed from the actual furnishing of the coal to the engines, and this precluded that close relation of his work to interstate commerce which would bring him within the scope of the federal act. So, in this case, Butler was working on the part of the line between the main power-house and a substation. The current was still to pass through the transformers and converters, and be so converted and reduced as to be suitable for use in propelling the cars. The test of remoteness seems as applicable in the one case as in the other. It is true, as petitioner claims, that the electric current, once it is generated at the main power-house, passes along the main power line, to and through the converters and transformers in the substations, and to the trolley wires, without interruption, and without storage. No doubt, too, a break in that current at any point, however remote from the lines of track, would

immediately stop the progress of all cars then moving. But we think the decisive factor in the case is not to be sought in these characteristics of electric energy. As the supreme court of the United States says, "the federal act speaks of interstate commerce in a practical sense suited to the occasion." (*Shanks* v. *Delaware, L. & W. R. R. Co., supra; Chicago, B. & Q. R. R. Co.* v. *Harrington, supra.*) Viewing the question before us in this light, we think the answer to it should be the same as that given in the Harrington case. The main power line is not part and parcel of the railroad or its equipment, in the same sense as the roadbed or the trolley line. It is an instrumentality by means of which something necessary for the operation of the cars is brought to a point where it can be usefully applied. Its purpose is simply to get to the road the necessary power to operate cars thereon— the same purpose served by wagons or cars laden with coal to be carried to the road for the operation of its locomotives. Even though the power flows without interruption from the power-house to the trolley lines, it still remains that all that the main line does, and all that those engaged in keeping it in order do, is to assist in putting on to the trolley line the necessary power to be used by the operatives of the road as desired—or, to paraphrase the language already quoted from the Harrington case, "putting the electric power [coal supply] in a convenient place from which it could be taken as required for use."

We think, therefore, that the commission was justified in exercising jurisdiction.

The award is affirmed.

Victor E. Shaw, J., *pro tem.,* Richards, J., *pro tem.,* and Angellotti, C. J., concurred.

WILBUR, J., Dissenting.—I dissent.

The test is stated by the supreme court of the United States to be, "Was the employee at the time of the injury engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?" The deceased was engaged in working upon an insulator that supported a wire that was actually in use in moving trains engaged in interstate commerce, and was killed by a fall resulting from a shock caused by an escape of some of the electric current so used. His

connection with the actual movements of trains was so direct that had all the current short-circuited through his body, its effect on the trains in motion would have been instantaneous.

The electricity in question was generated at a steam-generating plant at Fruitvale. That steam plant was just as truly operating the moving cars as though the steam had been generated in a locomotive attached to the train. The electric transmission line was merely a means of conducting that power to the train, and in no sense differs in legal contemplation from the system of transmission of power by cable to the cars of a cable railroad. It is merely a means to an end; an instrumentality for moving interstate commerce; a method of applying the potential energy of coal and fuel oil to the movement of a train. The instant the potential energy was converted into kinetic energy it became the proximate cause of train movement, and the instrumentalities used in applying it to the interstate commerce is as much a part of the system of transportation as the car in which the passenger or freight rides. The intimate connection with the actual movement of trains is shown by the fact that the instant the power plant ceases to operate, or the transmission wire breaks, the car upon the railroad track, whether it be ten miles or five hundred miles away, immediately stops. The fact that in transmitting this power it passes through what is known as transforming stations has no significance whatever. It must be conceded that distance is not a factor in the determination of the question whether or not a person is engaged in interstate commerce. For instance, no one would doubt that if a train-dispatcher on Eiffel Tower, Paris, operated trains on an interstate railroad in California from there, he would be engaged in interstate commerce. The question of the method of the transmission of his orders would likewise be immaterial. He might use wireless across the Atlantic Ocean, a telegraph wire from New York to San Francisco, and a telephone from San Francisco to the station agent, who writes the message and hands it to the conductor. It would make no difference if the message was originally written and transmitted in French and was afterward translated into English. It is obvious that the true question is, "Were the messages that were sent by the train-dispatcher obeyed by the train crews in operating their trains?" So the question here is, "Was the power passing along the power line the proximate cause of

the motion of the trains?'' If so, those engaged in operating or maintaining the devices by which the power is transmitted would, upon the principle above stated, be engaged in interstate commerce. That this power so transmitted was the proximate cause of the movement of the trains would seem to be conclusively answered in the affirmative by the fact that any break in the power line instantaneously affects the moving trains. The transforming stations referred to in the majority opinion are merely a means to an end, viz., the transmission of the power from the steam plant to the train. The fireman in the generating plant is as truly engaged in moving interstate commerce as is the fireman of a locomotive hauling such commerce. In each case the fireman is putting into the firebox potential energy in the form of coal or oil. That energy before it is applied to the cars must first be converted into heat, a form of kinetic energy, and then from heat into train motion. The fact is that both are actually engaged in moving the train by the process of converting the potential energy stored in coal or oil into the movement of a train. If there were some process involved in the scheme of electrical transmission of power similar to the storage of coal—in other words, if the electricity was stored in one place, as oil or coal may be stored, and thus reconverted into potential energy, and then used out of the storage batteries, as in the case of an electric automobile, the situation might be analogous to that referred to in *Chicago, B. & Q. R. R. Co.* v. *Harrington,* 241 U. S. 177, [60 L. Ed. 941, 36 Sup. Ct. Rep. 517, 11 N. C. C. A. 992], but under the agreed facts there is no storage whatever. This case cannot be distinguished in principle from the case of *Southern Pacific Co.* v. *Industrial Accident Commission,* 174 Cal. 8, [L. R. A. 1917E, 262, 161 Pac. 1139], where a lineman was killed while engaged in removing a telephone wire which had fallen on a ''trolley wire of the same line involved in this proceeding.'' The power transmission line was but an extension of the trolley wire, as much a part of the system as feed wires along the track, or the span wires supporting the trolley wires.

Melvin, J., concurred.

Rehearing denied.