[Civ. No. 3296. Second Appellate District, Division Two.—November 26, 1920.]

JOHN BARTON PAYNE, as Agent, etc., Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT—INJURY TO RAILROAD EMPLOYEE —REPAIR OF ENGINE—INTERSTATE COMMERCE.—An employee of a railroad company engaged in repairing an engine in the general shops of the company in this state, which engine had been used for several months for the exclusive purpose of hauling heavy freight trains in interstate commerce, and which had been placed in the shops for general overhauling, whereupon it was the intention to return it to its regular service and which was in fact so returned, was engaged in work so intimately connected with interstate commerce as practically to be a part of it, and the state Industrial Accident Commission was without jurisdiction to make an award for injuries received by such employee while tapping the boiler of the engine.

PROCEEDING in Certiorari to review an order of the Industrial Accident Commission. Award annulled.

The facts are stated in the opinion of the court.

Fred E. Pettit, Jr., and E. E. Bennett for Petitioner.

A. E. Graupner and Warren H. Pillsbury for Respondents.

WELLER, J.—This proceeding was brought to review the action of the Industrial Accident Commission of California in awarding compensation to one O. J. Burton for

injuries sustained by him in the line of his employment under Walker D. Hines, director-general of railroads, operating the Los Angeles and Salt Lake railroad.

On February 1, 1919, when he received the injury, Burton was engaged in repairing engine No. 3673 in the general shops of the Salt Lake railroad at Los Angeles. While tapping the boiler of the engine a piece of steel, blown from the exhaust of a compressed-air motor operated by men working near him, lodged in his left eye, causing the injury for which he was awarded compensation. This locomotive had been used several months for the exclusive purpose of hauling heavy freight trains in interstate commerce between points in the states of Nevada and California, on the main line of the railroad. On the 19th of December, 1918, it was placed in the shops at Los Angeles for general overhauling and the installation of a superheating apparatus to increase the steam pressure, whereupon it was the intention to return it to its regular service. It was estimated that this work would be finished about January 30, 1919, but owing to delay in delivery of necessary materials it was not actually completed until about February 21, 1919. After the repairs had been made the engine was given a trial for several days in the yards of the company at Los Angeles, in accordance with the usual custom, without cars attached. On February 25, 1919, it hauled a freight train from Los Angeles to San Pedro, and on the following day returned to Los Angeles with a similar train, a portion of the cargo in both instances being consigned to points outside of California. It was testified that the trip to San Pedro was a part of the process of "breaking in" after a locomotive had undergone extensive repairs. After this run to San Pedro the engine was returned to the shop, remaining there until March 4, 1919, when it was sent out attached to a through freight train, and resumed its former run between Yermo, California, and Caliente, Nevada, on the main line of the railroad, where it has ever since been used.

This rather elaborate detail seems essential to a thorough understanding of the facts, which are uncontroverted. It is conceded that if the Industrial Accident Commission of California had jurisdiction of the case, the award is just and proper in all respects.

The sole question presented for our consideration is: Was the engine, at the time of the accident, engaged in interstate commerce, within the meaning of the Federal Employer's Liability Act (35 Stats. 65 [8 Fed. Stats. Ann., 2d ed., p. 1208; U. S. Comp. Stats., sec. 8657])?

The answer to this simple proposition is rendered difficult by the apparent conflict of decisions of the various courts, federal and state, which have been called upon to apply the law to the facts in issue in particular cases. It is complicated by reason of the fact that no fixed rule has been established by the supreme court of the United States for the application of the statute. It has held that each case must be decided in the light of the particular facts with a view to determining whether, at the time of the injury, the employer is engaged in interstate business, or in an act which is so directly and immediately connected with such business as substantially to form a part or necessary incident thereof. (*New York C. & H. R. Co.* v. *Carr*, 238 U. S. 260, [59 L. Ed. 1298, 35 Sup. Ct. Rep. 780, see, also, Rose's U. S. Notes].) Where the employer is engaged in both intrastate and interstate commerce, and the instrumentalities are used indiscriminately in both, the line of demarcation between the two classes of business is exceedingly difficult to trace. A *résumé* of some of the decisions will serve to illustrate this point.

In *Louisville & Nashville R. Co.* v. *Parker*, 242 U. S. 13, [61 L. Ed. 119, 37 Sup. Ct. Rep. 4], the employee was engaged in switching a car not moving in interstate commerce from one track to another, for the purpose of reaching and moving an interstate car; and it was held that he was engaged in interstate commerce. The court says: "The difference is marked between a mere expectation that the act done would be followed by other work of a different character, and doing the act for the purpose of furthering the later work."

*New York C. R. Co.* v. *Carr, supra,* was a case where two cars carrying interstate freight were uncoupled from an interstate train and backed into a siding, where the employee was injured. We quote from the decision: "The matter is not to be decided by considering the physical position of the employee at the moment of injury. If he is hurt in the course of his employment while going to a car

to perform an interstate duty, or if he is injured while preparing an engine for an interstate trip, he is entitled to the benefit of the federal act, although the accident occurred prior to the actual coupling of the engine to the interstate cars."

In the case of *Erie R. Co.* v. *Winfield,* 244 U. S. 170, [Ann. Cas. 1918B, 662, 61 L. Ed. 1057, 37 Sup. Ct. Rep. 556], an employee was in charge of a switch engine which was used in switching cars about in the yard, especially to and from a transfer station, some cars containing interstate freight, others intrastate, and still others carrying both classes. After completing his day's work, he put his engine away and started to leave the yard. While crossing a track on his way out, he was struck by an engine and killed. It was held that, as his work was particularly interstate, and his leaving the yard was a necessary incident to his employment, he was at the time engaged in interstate commerce within the purview of the federal act.

*New York C. R. Co.* v. *Porter,* 249 U. S. 168, [63 L. Ed. 536, 39 Sup. Ct. Rep. 188], determined that a workman engaged in removing snow from tracks used for the transportation of interstate and intrastate commerce was entitled to compensation under the federal law.

In *Philadelphia, B. & W. R. Co.* v. *Smith,* 250 U. S. 101, [63 L. Ed. 869, 39 Sup. Ct. Rep. 396], the employee was the cook of a construction crew which was employed in repairing bridges at different places along the line. The court stated that as he was actually assisting the bridge carpenters by keeping their bed and board close to their place of work, he was engaged in interstate commerce.

*Pederson* v. *Delaware, L. & W. R. Co.,* 229 U. S. 146, [Ann. Cas. 1914C, 153, 57 L. Ed. 1125, 33 Sup. Ct. Rep. 648, see, also, Rose's U. S. Notes], decided that an employee who was carrying bolts to be used in repairing an interstate railroad, and was injured by an interstate train while performing that duty, was within the terms of the federal statute.

*Shanks* v. *Delaware, L. & W. R. Co.,* 239 U. S. 556, [L. R. A. 1916C, 797, 60 L. Ed. 436, 36 Sup. Ct. Rep. 648, see, also, Rose's U. S. Notes], enunciates the principle that a workman employed in removing and installing fixtures in a machine-shop which is conducted for repairing loco-

motives used in both interstate and intrastate transporta-
tion is not entitled to the benefit of the federal act. The
court in its opinion says: "The connection between the fix-
ture and interstate transportation was remote at best, for
the only function of the fixture was to communicate power
to machinery used in repairing parts of engines, some of
which were used in such transportation."

In the case of *Chicago, B. & Q. R. Co.* v. *Harrington,*
241 U. S. 177, [60 L. Ed. 941, 36 Sup. Ct. Rep. 517], the
workman was employed with a crew in switching cars of
coal to sheds, where it was placed in chutes, thence to be
used to supply coal to engines engaged in both classes of
transportation. The court held that he was not in inter-
state commerce, stating that "manifestly there was no such
close or direct relation to interstate transportation in the
taking of the coal to the coal chutes."

The above citations will suffice to indicate the subtle
distinctions which have been drawn by the supreme court
of the United States in interpreting and applying the Fed-
eral Employer's Liability Act.

Coming now to the decisions of our own supreme court
construing these authorities, we encounter a direct conflict
which adds to the difficulty of reaching a satisfactory solu-
tion of the problem.

In the case of *Southern Pacific Co.* v. *Pillsbury,* 170 Cal.
782, [L. R. A. 1916E, 916, 151 Pac. 277], the Industrial
Accident Commission of California had assumed jurisdic-
tion, under substantially the following facts: A workman
named Ruth was repairing a switch-engine which had been
withdrawn from service in the yard at Roseville Junction,
California, where some seventy per cent of the switching
was interstate commerce work. While thus engaged, Ruth
received injuries resulting in his death. The accident oc-
curred during the time the engine was in the roundhouse
undergoing repairs and three days before it was restored
to service. Our supreme court annulled the award, after
discussing the decisions of the federal courts, some of which
we have cited. On May 21, 1917, without filing an opinion,
the supreme court of the United States denied a petition
for a writ of *certiorari* whereby it was sought to review
the decision of the state court.

On January 8, 1917, the supreme court of the United States rendered an opinion in the case of *Minneapolis & St. Louis R. Co.* v. *Winters*, 242 U. S. 353, [Ann. Cas. 1918B, 54, 61 L. Ed. 358, 37 Sup. Ct. Rep. 170], from which we quote: "The agreed statement is embraced in a few words. The plaintiff was making repairs upon an engine. This engine 'had been used in the hauling of freight trains over defendant's line, . . . which freight trains hauled both interstate and intrastate commerce, and it was so used after plaintiff's injury.' The last time before the injury was on October 18th, when it pulled a freight train into Marshalltown, and it was used again on October 21st, after the accident, to pull a freight train out from the same place. That is all we have, and it is not sufficient to bring the case under the act. This is not like the matter of repairs upon a road permanently devoted to any kind of traffic, and it does not appear that *this engine was destined especially to anything more definite than such business as it might be* needed for. It was not interrupted in an interstate haul to be repaired on go on. It simply had finished some interstate business and had not yet begun upon any other. *Its next work, so far as appears, might be interstate or confined to Iowa,* as it should happen. At the moment it was not engaged in either. Its character as an instrument of commerce depends upon its employment at the time, and not upon *remote probabilities* or upon *accidental later events."* (Italics ours.)

On the authority of the Winters case, our supreme court, in *Hines* v. *Industrial Acc. Com.*, 184 Cal. 1, [14 A. L. R. 720, 192 Pac. 859], filed October 4, 1920, affirmed an award to one Brizzolara, under circumstances somewhat similar to those in the Ruth case, *supra.* The finding of the commission in the Brizzolara case was as follows: "That at the time of said injury and death said employee was engaged in making repairs upon a switch engine, which had been temporarily withdrawn from service therefor. That when in service, said switch engine was used in both interstate and intrastate traffic. That the evidence herein is insufficient to establish as a fact that the proportion of said interstate use exceeded or amounted to thirty per cent of the whole." After quoting from the decisions of the United States supreme court, the opinion proceeds to state that the

ruling in the Ruth case is at variance with the holding in the Winters case, and that the Ruth case, therefore, cannot be considered as controlling, notwithstanding that the Ruth case was affirmed by the United States supreme court some four months after the Winters case was decided.

Some of the other adjudications of our supreme court are illuminating upon this intricate problem. It has been held that a watchman at a railroad crossing used for both interstate and intrastate traffic is engaged in interstate business while employed in keeping the track clear of obstructions in order to facilitate the passage of interstate trains. (*Southern Pac. Co.* v. *Industrial Acc. Com.*, 174 Cal. 8, [L. R. A. 1917E, 262, 161 Pac. 1139] ; *Southern Pac. Co.* v. *Industrial Acc. Com.*, 174 Cal. 16, [161 Pac. 1142].) An electric lineman employed in the removal of an overhead telephone wire which had fallen on the trolley wire used by a railroad for furnishing electric power for the operation of cars of the railroad's interstate and intrastate passenger system was engaged in interstate commerce, as he was then engaged directly in removing an obstruction to the operation of an instrumentality in actual use for purposes of such commerce. (*Southern Pac. Co.* v. *Industrial Acc. Com.*, 174 Cal. 19, [161 Pac. 1143].)

In the case of *Southern Pac. Co.* v. *Industrial Acc. Com.*, 178 Cal. 20, [171 Pac. 1071], one Butler was killed by an electric shock received while he was wiping insulators on the main power line of an interstate and intrastate system, between the power-house and substations. The electrical energy was generated at this power-house and conveyed in an alternating current of high voltage to the substations, there converted and transformed to a direct current of reduced voltage, thence passed to the trolley wires, and from there to the motors on the cars. Our supreme court applied the principle of the Harrington case, *supra*, and decided that the work being done by Butler was analogous to the situation of an employee loading coal chutes for the supply of interstate engines, and held that Butler's employment was too remote from interstate commerce to bring him within the federal statute. This action was reversed by the supreme court of the United States (251 U. S. 259, [64 L. Ed. 258, 40 Sup. Ct. Rep. 130]), the court saying: "Generally, when applicability of the Federal Employ-

er's Liability Act is uncertain, the character of the employment, in relation to commerce, may be adequately tested by inquiring whether, at the time of the injury, the employee was engaged in work so closely connected with interstate transportation as practically to be a part of it. Power is no less essential than tracks or bridges to the movement of cars. The accident under consideration occurred while deceased was wiping insulators actually supporting a wire which then carried electric power so intimately connected with the propulsion of cars that if it had been short-circuited through his body they would have stopped instantly. Applying the suggested test, we think these circumstances suffice to show that his work was directly and immediately connected with interstate transportation and an essential part of it.''

The cases which most closely parallel the one we have under consideration are found in the decisions of the circuit courts of appeals; and though they are not expressions of the court of last resort, nevertheless they may guide the action of the state courts in determining the applicability of the federal statute.

*Law* v. *Illinois Cent. R. Co.*, 208 Fed. 869, [L. R. A. 1915C, 17, 126 C. C. A. 27], was decided by the circuit court of appeals of the sixth circuit. A boilermaker's helper was injured in the shops of the railroad company at Memphis, Tennessee, while assisting the boilermaker in repairing a freight engine regularly used in interstate commerce. The engine was in the shop for what is called "roundhouse overhauling," and had been dismantled at least twenty-one days before the accident. Up to the time it was taken to the shop it had been regularly used in interstate commerce, was destined to return thereto on completion of the repairs, and did so return the day following the accident. In the opinion holding the federal act applicable to the facts, the court propounds the following pertinent interrogatories: "Under the existing facts, can the length of time required for the repairs change the legal situation? If so, where is the line to be drawn? How many days temporary withdrawal would suffice to take it out of the purview of the act? And is it material whether the repairs take place in the roundhouse or in general shops? Is not the test whether the withdrawal is merely

temporary in character?" Further quoting from the opinion: "As held in the Pederson case, the work of keeping the instrumentalities used in interstate commerce (which would include engines) in proper state of repair while thus used is so clearly related to such commerce as to be in practice and in legal contemplation a part of it."

In *Northern Pac. R. Co.* v. *Maerkl*, 198 Fed. 1, [117 C. C. A. 237], the circuit court of appeals of the ninth circuit held that an employee engaged at the railway shops in making repairs upon a refrigerator car theretofore used indiscriminately in intrastate and interstate commerce, and intended again to be so used when repaired, was one of the instruments of interstate commerce.

Some general statements in the opinion in the Brizzolara case, *supra*, might seem to be determinative of the issues here involved; but a perusal of the opinion discloses that such statements, in so far as they attempt to state the legal principles applicable to all engines, are not warranted by the decision in the Winters case, *supra*, upon which they purport to be based. The Winters case turned upon the proposition that the future use of the engine was undetermined, and that its character as an instrumentality of interstate commerce could not be made to depend upon remote possibilities or upon accidental later events. The switch engine involved in the Brizzolara case, when in service, was used in both interstate and intrastate traffic—the proportion of each not being ascertainable from the evidence. It does not appear that it was intended for such service in the future, or that it was utilized for any purpose whatever after being repaired. The facts in the instant case are distinguishable from those in either the Winters case or the Brizzolara case. Here the engine was permanently devoted to interstate commerce, was destined to return to that service on completion of the necessary repairs, and was so returned when placed in condition for such use. It would seem that the length of time it was out of commission is immaterial, so long as it was the intention to maintain its character as an instrumentality of interstate commerce. As stated in the Parker case, *supra*, "the purpose controls, and the business is interstate." Its future use was not dependent upon "remote probabilities or accidental later events," but, so far as purpose and inten-

tion are concerned, its continued use in interstate traffic was as certain as anything in human affairs can be predetermined.

[1] In the light of the decisions, we conclude that, at the time of the accident, Burton was engaged in work so intimately connected with interstate commerce as practically to be a part of it, and, therefore, that the Industrial Accident Commission of California had no jurisdiction.

Award annulled.

Finlayson, P. J., and Thomas, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on December 24, 1920, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 24, 1921.

Shaw, J., Lennon, J., Olney, J., and Sloane, J., concurred.

Angellotti, C. J., Lawlor, J., and Wilbur, J., dissented.