# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

### CHICAGO, K. & S. RY. CO. v. KINDLESPARKER.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1916.)

### No. 2757.

1. COMMERCE ☞27—INTERSTATE COMMERCE—FEDERAL EMPLOYERS' LIABILITY ACT.

A railroad lying wholly within a state, which formed a link between carriers whose lines extended without the state, and which indiscriminately transported interstate shipments and intrastate shipments, is an interstate carrier, within the federal Employers' Liability Act (Act April 22, 1908, c. 149, § 1, 35 Stat. 65 [Comp. St. 1913, § 8657]), declaring that every common carrier by railroad, while engaging in commerce between the several states, shall be liable in damages by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, roadbed, etc.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. COMMERCE ☞27—INTERSTATE COMMERCE—INSTRUMENTALITIES THEREOF.

A railroad lying within a state, forming a link between interstate carriers, transported both interstate and intrastate shipments and passengers. The freight and passengers of both kinds were commingled, and the several engines of the road were indiscriminately used in hauling trains transporting both kinds of freight and in switching cars similarly loaded. Held, that an engine devoted to such purposes was an instrumentality of interstate commerce, and therefore one injured in repairing such an engine may sue under the federal Employers' Liability Act; the repairer's services partaking of the nature of the instrumentality.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

3. COMMERCE ☞27—INTERSTATE COMMERCE—INSTRUMENTALITIES THEREOF.

Where an engine used in interstate commerce was withdrawn from service for repairs, and on being repaired was again used to transport interstate commerce, the engine, though the repairs extended over several months, was not withdrawn from interstate commerce, and a repairer injured might sue under the federal Employers' Liability Act.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

234 F.—1

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Action by Gale Kindlesparker against the Chicago, Kalamazoo & Saginaw Railway Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

S. E. Knappen, of Grand Rapids, Mich., for plaintiff in error.

C. F. Hext, of Grand Rapids, Mich., for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and SANFORD, District Judge.

WARRINGTON, Circuit Judge. Kindlesparker recovered a verdict and judgment under the federal Employers' Liability Act for personal injuries sustained while in the employ of the railroad company; it will be convenient to refer to Kindlesparker as plaintiff, and the railroad company as defendant. The sole issue presented here is whether plaintiff was engaged in interstate commerce at the time he received his injuries. The southern terminus of defendant's railroad was at Kalamazoo and the northern terminus at Woodbury, within the state of Michigan, and the business consisted of general passenger and freight traffic. The railroad, however, connected with "all of the roads" passing through Kalamazoo, and at Woodbury with the Pere Marquette line. It is not shown what railroads pass through Kalamazoo, though the superintendent testified that defendant's local agent in that city "would have the records of shipments, say from any station on our line to Chicago." Further, it was conceded by defendant, at the trial below, that the freight trains operated on its line "contained indiscriminately cars bound between—cars and freight generally bound between—points entirely within this state, and points from outside of the state to this state, and from points in this state to points outside of the state"; and admittedly the defendant's connection at Woodbury was with an interstate road—the Pere Marquette line.

The defendant owned and operated six locomotive engines; only three of these engines were used daily, one in the passenger service, and one in the freight traffic over the line, and one in the switching service at Kalamazoo. The other three, except on extraordinary occasions, were kept in the roundhouse and ready for service, or in the shops under repair; in other words, subject to this rotation in service, five of the engines were used alike in general service and one of them in switching service; and the engines were all used indiscriminately in the movement of intrastate and interstate traffic, regardless of the particular service in which they were employed.

Plaintiff received his injuries from engine No. 4, July 3, 1914, and while engaged in repairing it. He was in the employ of defendant as helper in its shops at Kalamazoo, and at times acted as fireman. April 15, 1914, engine No. 4 was placed in the shops for general repairs, and the repairs were completed July 4th. July 3, engine No. 4 was removed under its own steam from the shops to the turntable, where the boiler maker "set the pops"; it was then taken to the cinder pit, and plaintiff, acting under instruction to enter the pit beneath the engine and place the grease cellar upon it, received his injuries while

so engaged. This was the last work required in the repair of the engine, and it was completed by another person on the day following. As regards this engine it was agreed at the trial, as follows: That for eleven days in March, between the 3d and 31st, and for four days in April, from the 1st to the 4th, inclusive, the engine was used in the switching service at Kalamazoo; March 12th, 13th, and 14th it was used in the passenger service between Kalamazoo and Woodbury; on all other days between March 1st and April 15th it was not in use; and after the repairs were completed, the engine was used for six days in July, between the 7th and 16th, in the switching service at Kalamazoo, for four days in that month, between July 13th and 20th, in the freight service between Kalamazoo and Woodbury, and on all other days between the 3d and 20th of July it was not in service of any kind. It was further stipulated that while engine 4 was used in switching operations, as stated, "it handled indiscriminately intrastate and interstate freight," and while used in freight operations as pointed out, the freight trains were "composed of cars containing intrastate and interstate commerce."

[1] In determining whether plaintiff was engaged in interstate commerce at the time of his injuries, consideration must be given to the character of the instrumentality upon which he was working and the nature of the work he was performing. The character of the locomotive, the instrumentality, may be ascertained both from the nature of the railroad on which defendant was accustomed to operate the engine and of the traffic handled by it. In view of all the facts above pointed out, it would seem plain enough that defendant's road constituted a link in interstate lines for all purposes of interstate and intrastate traffic. At the time in question, as we have seen, defendant was transporting freight both ways upon its line, and also handling freight in its yards, which originated upon its connections at points without and was destined to points within the state and also freight which originated within and was destined to places without the state; and, it is true, defendant was also transporting freight originating and destined locally within the state. The former fact, however, concerning freight interstate cannot be ignored because of the latter fact touching freight intrastate. Every road, which physically extends into or through two or more states and is so operated, necessarily carries both classes of freight, interstate and intrastate, and yet we do not see how it can in reason be said of such a carrier that it is any more certainly "engaging in commerce between any of the several states," within the meaning of the Employers' Liability Act, than the present defendant was at the time plaintiff received his injuries; the latter situation as well as the former answers to the language of the act, "that every common carrier by railroad while engaging in commerce between any of the several states * * * shall be liable in damages * * * by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed," etc. 35 Stat. 65 (Comp. St. 1913, § 8657). True, defendant's railroad, in a physical sense, was entirely within the limits of the state of Michigan, but this did not prevent defendant from connecting the road with admittedly interstate lines and so engaging in interstate commerce; in every prac-

tical sense, according to the present record, defendant had at the time in question appropriated its road as well as its yards to the transportation and handling of interstate traffic as definitely as it had of traffic of an intrastate character, and these conditions existed at the time of the accident and afterwards. When a company thus in effect dedicates such a road and the yards to a dual use—interstate and intrastate—it invests the road with the characteristics of an interstate line and subjects it to the obligations of that sort of a line. It makes it a part of the through line and becomes entitled to a part of the receipts derived from the through service. Its duties must correspond with the benefits it seeks; it must respond to federal law and regulation; this, however, is not in any true sense violative of its rights and and duties as an intrastate carrier; nor does it open either the defendant or its road to the objectionable features found in the first Employers' Liability Act (Act June 11, 1906, c. 3073, 34 Stat. 232) 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. The principle declared in relation to rates over an intrastate road in Cin., N. O. & Tex. Pac. Railway v. Int. Com. Com., 162 U. S. 184, at page 192, 16 Sup. Ct. 700, at page 703 (40 L. Ed. 935), is applicable as regards the interstate character of the present railroad. It was there said:

"Having elected to enter into the carriage of interstate freights and thus subjected itself to the control of the Commission, it would not be competent for the company to limit that control, in respect to foreign traffic, to certain points on its road and exclude other points."

In United States v. Union Stockyards, 226 U. S. 286, 304, 33 Sup. Ct. 83, 88 (57 L. Ed. 226), when speaking of an intrastate service in connection with an interstate movement of freight, it was held:

"That the service is performed wholly in one state can make no difference if it is a part of interstate carriage."

It results that such an appropriation as defendant has made of its railroad and yards subjects it to the exactions of the federal Employers' Liability Act, since it prevents effective distinction from the rule laid down in the opinion of the court in the Pedersen Case, 229 U. S. 146, 152, 33 Sup. Ct. 648, 650 (57 L. Ed. 1125, Ann. Cas. 1914C, 153):

"True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce."

[2] We are therefore not convinced of the soundness of an argument urged by the learned counsel that defendant's road is primarily an instrument of intrastate commerce and that the plaintiff's rights must be tested upon the theory that the engine he was engaged in repairing was of the same character. We thus come to a consideration of the locomotive as an instrument of commerce, and of the kind of commerce in which plaintiff was engaged when injured. The considerations which have induced us to believe that defendant's road is an essential part of an interstate line, would naturally lead to a similar conclusion as respects the interstate character of the locomo-

tive. This does not mean that in point of character of instrumentalities —that is, whether interstate or intrastate—there is necessarily identity, not to say interdependence, between the railroad line and a particular locomotive passing over it; and yet it is apparent, and we understand counsel to claim, that in the present instance the nature of the service in which plaintiff was engaged when injured must depend largely upon the character of the engine he was repairing.

It has already been shown that defendant possessed six engines and used three of them respectively in the passenger, freight and switching service daily; that it used the engine in question, No. 4, in the switching service at Kalamazoo for fifteen days in March and April, 1914, in the passenger service for three days in March, in such switching service for six days between the 7th and 16th of July, and in the freight service for four days between the 13th and 20th of that month; that the engine was undergoing necessary repairs in the shops between April 15th and July 4th; that, except as to the service described, the engine was either idle or under repair between the dates of service in March and July, as stated; and that while this engine was used in switching operations, as stated, "it handled indiscriminately intrastate and interstate freights." It is to be observed that in describing the traffic operations in which the engine was used there is no showing of any specific intrastate service; such service as to switching was interstate and intrastate indiscriminately, and as to freight operations on the road the trains were "composed of cars containing intrastate and interstate commerce."

The nature and effect of such service as this, both before and after the period of repair, now becomes still more evident. It was the same double service to which the road and yards and (when in use) all the engines of the company were alike constantly devoted; the strong tendency of the evidence is that the service was uniformly of such a nature that the engine in issue could not at any time have been placed in use at all (it certainly was not put in use) except in this double and unitary character of service—if indeed this was not true as to all the engines. The inevitable effect of this service was to impress every instrumentality, so used, with an interstate character, quite as certainly as with an intrastate character, and also to impose upon the carrier the same degree of duty and liability respecting the fitness and condition of the instrumentality for use under the federal act as if it had been designed and used exclusively for interstate service; indeed, while such conditions as are here shown prevailed, the instrumentality was not susceptible of use or repair without regarding and treating it as an instrument of interstate commerce. This is not to say that if plaintiff had been engaged as engineman or fireman and injured in operating this engine while handling purely intrastate commerce, he could have recovered under the federal act; nor is it to say that in such event the service which the engine may have performed either before or after the accident, would have changed the nature of the service he was so performing as engineman or fireman at the time of his injury. The theory of the carrier's nonliability in the situation thus assumed is for present purposes sufficiently illustrated by the decision of the Supreme Court in Chicago, Burlington & Quincy

R. R. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. Ed. 941, decided May 1, 1916, and by the decisions there commented on. But those decisions are a class of their own, and as a rule the cases they determine are respectively dependent upon their own peculiar facts (Pittsburgh, C., C. & St. L. Ry. v. Glinn, 219 Fed. 148, 150, 135 C. C. A. 46 [C. C. A. 6]); however, the situation so assumed is not involved here. We are concerned with an injury suffered in the course of repairing the engine, not in its use or operation.

When the decisions are considered, which, on the one hand, allow recovery, and on the other disallow recovery, under the federal act, a marked distinction is found concerning the responsibility of a carrier for injuries suffered by an employé engaged in repairing an instrument interstate in character, and injuries received by an employé using or operating the same kind of an instrument while handling only intrastate traffic. As to the repairer, his service partakes of the character of the instrumentality; as to the operative, his service partakes of the character of the traffic. The reason for this distinction is that the repair is so directly and vitally related to commerce between the states as to characterize the work of the employé engaged in the repair as an act of interstate commerce. This distinction, for example, is well stated by Judge Woolley in Boyle v. Pennsylvania R. Co., 228 Fed. 266, 142 C. C. A. 558, where, in view of the facts of that case, the reason for denying application of decisions which concern the repair and not the use of the instrumentality in question received expression (228 Fed. 269, 142 C. C. A. 561):

"There is a distinction between employment in preparing an instrument of commerce for use, and employment in using such an instrument in commerce. Preparation of an instrument for use in commerce of both kinds necessarily means preparation for use in commerce of either kind, and as one kind is interstate commerce, it follows logically that such preparation is for use in interstate commerce, but employment connected with the actual use of such an instrument is a part of intrastate or interstate commerce according as the instrument is in use in commerce of one kind or the other."

Under the facts of the instant case, however, the controlling illustration of the distinction thus sought to be made clear, appears in the Pedersen Case, where it was held that a railroad company engaged in interstate commerce was liable to its employé who suffered injury while carrying bridge bolts for use in repairing one of the company's railroad bridges, Mr. Justice Van Devanter saying (229 U. S. 151, 152, 33 Sup. Ct. 649 [57 L. Ed. 1125, Ann. Cas. 1914C, 153]):

"Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency * * * in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. * * * The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?"

Aside from a claim urged by counsel that the length of time consumed in repairing engine No. 4 amounted to a withdrawal of the engine from use in interstate commerce, which will be considered later, further relevant instances of liability under the federal act for injuries incurred by employés while engaged in repair work may be seen in the following decisions: Walsh v. N. Y., N. H. & H. R. R. Co., 223 U. S. 5, 6, 59, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, affirming recovery for injuries received by plaintiff while engaged in replacing the drawbar of a car then in use in interstate commerce; Central R. Co. of New Jersey v. Colasurdo (1911) 192 Fed. 901, 903, 113 C. C. A. 379 (C. C. A. 2), approving judgment in favor of plaintiff, who, while engaged in the repair of a yard switch, was struck and injured by a car employed by defendant in interstate commerce—the fact that the carrier and the employé may also have been engaged in intrastate commerce being regarded as immaterial; Northern Pacific Ry. Co. v. Maerkl (1912) 198 Fed. 1, 4, 5, 117 C. C. A. 237 (C. C. A. 9), sustaining recovery in favor of an employé injured while engaged at shops in repairing refrigerator car, which had been "indiscriminately used in interstate and intrastate commerce, and was to be again so used when repaired"; B. & O. R. Co. v. Darr (1913) 204 Fed. 751, 753, 124 C. C. A. 565, 47 L. R. A. (N. S.) 4 (C. C. A. 4), affirming judgment for injury suffered by an employé when replacing hanger bolt in brace beam of engine's tender while it was standing on "fire track," to which removal had been made for the purpose; Law v. Illinois Cent. R. Co. (1913) 208 Fed. 869, 871, 126 C. C. A. 27, L. R. A. 1915C, 17 (C. C. A. 6), reversing denial of recovery by boiler maker's helper, who was injured in shops while repairing freight engine regularly employed in interstate commerce, though 21 days had been consumed in making all the repairs; Thomas v. Boston & M. R. R. (1915) 219 Fed. 180, 181, 182, 134 C. C. A. 554 (C. C. A. 1), reversing judgment sustaining demurrer to declaration alleging injuries to railroad carpenter while engaged in repairing roundhouse, which, under allegations, was regarded as an instrumentality of interstate commerce; and see, although case not finally disposed of, Gaines v. Detroit, etc., R. Co. (1914) 181 Mich. 376, 148 N. W. 397, reversing judgment under common-law count and remanding for further proceedings, on ground that case arose under federal act, plaintiff having been injured while engaged at defendant's yards in repairing drawbar of car carrying interstate freight, although the railroad, like the one involved in the instant case, lies wholly within the state of Michigan.

We are not unmindful of the contention of counsel that analysis of the decision in the Pedersen Case fairly shows that the court did not intend the rule there laid down as to railroad tracks and bridges to be extended to an ambulatory instrument like an engine, which may be used entirely for one or the other kind of commerce, or both kinds. It is true that after enumerating tracks, bridges, engines and cars as instrumentalities in interstate commerce, the court mentioned the fact that it was then concerned "only with the work of maintaining them in proper condition after they had become such instrumentalities and during their use as such"; but this is in recognition of the fact that

engines and cars are as essential to commerce and as fit to be invested with a status in commerce, and so to become the subjects of maintenance therein, as tracks and bridges are, and Congress has made no distinction between the two classes of instrumentalities. The federal act, as we have seen, points out the objects as to which duty and liability are imposed by distinctly associating engines and cars with appliances, machinery, tracks and roadbed; and the *power to enact* such legislation was sanctioned in the Second Employers' Liability Cases, 223 U. S. at 46, 47, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, by the announcement of certain propositions which were declared to "have come to be so firmly settled as no longer to be open to dispute"; one of which (223 U. S. 47 [5], 32 Sup. Ct. 174 [56 L. Ed. 327, 38 L. R. A. (N. S.) 44]) is:

"Among the instruments * * * to which the power extends are the railroads over which transportation from one state to another is conducted, (and) the engines and cars by which such transportation is effected. * * *"

In view of that decision and the other decisions before cited, it cannot be necessary to dwell upon this feature of counsel's argument.

[3] It is, however, earnestly claimed, as stated, that the engine in dispute had been withdrawn from use in interstate commerce, and consequently that the engine cannot be regarded as an instrument, nor the plaintiff's work thereon as an act, of such commerce. No evidence was offered tending to show any intention on the part of defendant to withdraw the engine from active use, except only for the purpose of necessary repairs. This results from the testimony of defendant's employés, among whom was the superintendent who stated that he could not tell how long the engine had been out of repair, but that it had been "in a general decrepit state for some time." It is not suggested that the engine was kept in the shops for a longer time than was required for its repair; and certainly such a fact is not to be presumed. We need not repeat that within three days after completion of the repairs, the engine was placed in the same service as that in which it was used before; nor is it necessary to point out again the fact that defendant's service on the road and in the yards comprised a constant double use—interstate and intrastate. Plainly, in view of the evidence actually introduced, the burden rested upon defendant affirmatively to show an intent on its part, if such was the fact, to make a permanent withdrawal of this engine from use in interstate commerce; in the absence of such proof, its admitted conduct in so quickly returning the engine to its former service cannot be explained, except upon the theory that the purpose of the withdrawal was to refit the engine for the same service and therefore but temporary in character. This court, in Pittsburgh, C., C. & St. L. Ry. Co. v. Glinn, supra, 219 Fed. 148, 150, 135 C. C. A. 46, 48, had occasion to say of certain decisions there commented on:

"They hardly go beyond fixing the burden of proof and declaring that, where the facts show the case may well have been within the statute (federal Employers' Liability Act), the initial burden is satisfied, and it is for the defendant to show the contrary."

Nothing then remains to consider in regard to the claim of withdrawal save its legal effect; and this must be tested by the reasonable inference that may be deduced from the fact that the engine was undergoing repair in the shops during a period of 79 days. In the Law Case the engine involved was under repair 21 days; and of this we said (208 Fed. 872, 126 C. C. A. 30 [L. R. A. 1915C, 17]):

"Under the existing facts, can the length of time required for the repairs change the legal situation? If, so, where is the line to be drawn? How many days' temporary withdrawal would suffice to take it out of the purview of the act? And is it material whether the repairs take place in a roundhouse or in general shops? Is not the test whether the withdrawal is merely temporary in character?"

No sufficient answer to this could be found in that case; and the only difference perceived here is in point of time, not in principle.

We conclude upon the whole that the engine was at the time of the repair in question an instrument of the interstate commerce in which the defendant was engaged, and that the work of plaintiff thereon was a part of such commerce.

The judgment must be affirmed, with costs.