# Wytheville

## Chesapeake and Ohio Railway Company
## v.
## Peeler Mizelle.

June 14, 1923.

1. Master and Servant—*Contributory Negligence—Machinist Striking Point of Drill with Hard Steel Hammer—Case at Bar.*—In the instant case plaintiff, a machinist, was working upon the frame of an engine with a drill.  The drill hung and the machinist to loosen it struck the steel point of the drill with a hard steel hammer, and a piece of the drill flew off, striking plaintiff in the eye, causing the loss of the eye.  The proper method of loosening or driving the drill back would have been to use what is called a soft hammer—that is, a hammer made of either lead or copper.

   *Held:* That plaintiff was guilty of gross negligence.

2. Interstate Commerce — *Federal Employer's Liability Act — Whether Party Injured was Employed in Interstate Commerce—Machinist in Railroad Shops—Case at Bar.*—In the instant case plaintiff, a machinist, was injured in the shops of defendant railroad when working on an engine.  Both before and after the injury the engine ran between points in Virginia, hauling trains which carried both interstate and intrastate commerce.

   *Held:* That the plaintiff was not engaged in interstate commerce at the time he received his injury, and therefore was not within the provisions of the Federal employer's liability act.

3. Interstate Commerce—*Federal Employer's Liability Act—Whether Party Injured was Employed in Interstate Commerce—Machinist in Railroad Shops.*—An employee in a railway machine shop, operated for repairing parts of locomotives, used both in interstate and intrastate transportation, is not engaged in interstate commerce within the meaning of the Federal employer's liability act.

4. Interstate Commerce—*Federal Employer's Liability Act—Whether Party Injured was Employed in Interstate Commerce.*—The Federal employer's liability act gives redress only for injuries received in interstate commerce.  The employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace State jurisdiction and make applicable the Federal act.

5. Master and Servant—*Carriers—Liability of Intrastate Carriers for Injury or Death of Employees—Construction of Section 5791, Code of 1919.*—Section 5791 of the Code of 1919, as to the liability of intrastate common carriers by railroads operating by steam for injury to or death of employees, closely follows the language of the Fed eral employer's liability act, and the Supreme Court of Appeals will adopt the construction placed upon apposite language by the Supreme Court of the United States.

6. Statutes—*Construction—Statute Adopted from Another Jurisdiction.*—The general rule is that when the General Assembly adopts a statute which has been previously enacted by another sovereignty and construed by the courts of that sovereignty, then such previous construction of the statute is held to be also adopted.

7. Master and Servant—*Carriers—Liability of Intrastate Carriers for Injury or Death of Employees—Whether Worker in Machine Shop Engaged in Intrastate Commerce—Case at Bar.*—In the instant case plaintiff, a machinist, working on the repair of an engine in the shops of defendant railway, was not engaged in intrastate commerce (or transportation service) within the meaning of the Virginia statute, and hence cannot invoke either section 5791 of the Code of 1919, or section 5793, which applies to actions brought under section 5791. Plaintiff was not engaged in either interstate or intrastate commerce.

8. Master and Servant—*Interstate and Intrastate Commerce—Machinist in Shop—Meaning of Commerce.*—There are few occupations which are not intimately connected with commerce. Certainly every machine shop manufacturing enterprise is engaged in producing articles which are destined to be sold or used in connection with or transported in commerce. As used in section 5791 of the Code of 1919, and the Federal employer's liability act, the language means that there must be some direct connection with transportation in commerce. Work upon a railroad track or bridge is clearly embraced in the acts, so work upon an engine which is temporarily held either upon a track or in a shop is so directly connected with transportation in commerce as to come within the meaning of the acts. But an instrumentality of commerce, like an engine, which has been withdrawn from service for an indefinite time for repairs, is like an engine in the shop of the original builder.

9. Master and Servant—*Contributory Negligence—Employees of Railroads—Section 5792 of the Code of 1919.*—As the law now is in Virginia, expressed in section 5792 of the Code of 1919, contributory negligence is no longer an absolute bar to an action by an injured employee of any common carrier by railroad whose motive power is steam engaged in intrastate commerce, whether such employee is injured while engaged in such commerce or not. The test under this section is not whether at the time of his injury the employee was engaged in

intrastate commerce, but merely whether the defendant carrier is engaged in such commerce.

10. Master and Servant—*Contributory Negligence—Employees of Railroads—Section 5792 of the Code of 1919.*—In the instant case it was argued that section 5792, both in the Code and in the original act (Acts 1916, p. 763), should be construed together with the preceding section 5791 and the following section 5793; and that so construed all three refer to injuries suffered while the employees are engaged in intrastate commerce.

   *Held:* That such a construction would do violence to the language of the section.

11. Statutes—*Construction—Revisal of Code.*—In the general revisal of the Code the intent to change the meaning of the previous statute is not lightly to be inferred.

12. Master and Servant—*Contributory Negligence—Machinist Striking Point of Drill with Hard Steel Hammer—Instructions—Case at Bar.*— In the instant case, an action by a machinist for injuries sustained by him through striking the point of a steel drill, which had become jammed, with a hard steel hammer, the court refused to give an instruction requested by defendant on contributory negligence. The instruction was carefully drawn and was fully justified by the testimony of the plaintiff himself. The other instructions in the case did not cover the point, although the instructions granted at the instance of the plaintiff in general terms authorized the jury, if they found the plaintiff guilty of contributory negligence, to reduce the damages.

   *Held:* That the refusal of this instruction constituted harmful error.

13. Master and Servant—*Carriers—Liability of Intrastate Carriers for Injury or Death of Employees—Assumption of Risk—Sections 5791, 5792 and 5793 of the Code of 1919.*—There is nothing in section 5792 which denies the defense of assumed risk, though to a limited extent it is denied by section 5793 in actions brought under section 5791.

14. Master and Servant—*Assumption of Risk—Machinist Striking Point of Drill with Hard Hammer—Case at Bar.*—In the instant case a machinist was working upon the frame of an engine with a drill. The drill hung and the machinist to loosen it struck the steel point of the drill with a hard steel hammer, instead of a soft-headed hammer. Plaintiff had full knowledge that a soft hammer was the customary tool to use in such an exigency. He showed clearly that he knew the danger of using a hard hammer under such conditions.

   *Held:* That plaintiff with full appreciation of the danger assumed the risk.

15. Master and Servant—*Assumption of Risk—Machinist Striking Point of Drill with Hard Hammer—Rules Making Known to Employees where Tools Could be Obtained—Case at Bar.*—In the instant case, where a machinist was injured by striking the point of a drill with a hard

hammer, the court instructed the jury that it was the master's duty to have soft hammers accessible where the plaintiff could have obtained them, and to have promulgated rules showing how such tools could be obtained. Plaintiff had been working in the shop for months and knew how to seek the tools when needed in the course of his work. The soft hammer needed was a tool which was appropriate only for definite purposes.

*Held:* That there was nothing in the record to indicate that formal rules about so simple a matter were necessary or even expedient.

16. Master and Servant—*Assumption of Risk—Machinist Striking Point of Drill with Hard Hammer—Instructions.*—In an action by a machinist against his master for injuries occurring from the striking of the steel point of a drill with a hard hammer, it was error to refuse an instruction which clearly and simply brought to the attention of the jury the defense of assumed risk growing out of the voluntary use of a tool known to the plaintiff to be improper, as well as dangerous.

17. Damages—*Instructions—Allusion to the Amount of Damages.*—In the instant case, an action for personal injuries, exception was taken to two instructions given for the plaintiff in which the jury were told that the damages awarded the plaintiff should not exceed the sum of $15,000. Such instructions have been criticised by the Supreme Court of Appeals. If any allusion is to be made by the trial court to the extreme amount which the jury may allow in such cases, it should appear clearly that the only reason the amount is specified is because that is the sum which is claimed by the plaintiff in his declaration.

18. Appeal and Error—*Final Judgment by the Supreme Court of Appeals.*—In the instant case, an action by a machinist against his employer for injuries sustained through striking the steel point of a drill with a hard hammer, the Supreme Court of Appeals regarded the defense of assumed risk as established by the plaintiff's own evidence, and upon reversal of the judgment for plaintiff, entered final judgment in favor of the defendant.

Error to a judgment of the Hustings Court, Part Two, of the city of Richmond, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. H. & Walter Leake* and *Sherlock Bronson,* for the plaintiff in error.

*Lucius F. Cary* and *W. R. Meredith,* for the defendant in error.

Prentis, J., delivered the opinion of the court.

Peeler Mizelle, hereafter called the plaintiff, recovered of the plaintiff in error, hereafter called the company, for the loss of one of his eyes while employed by the company in its machine shops at Richmond. He was a machinist with seventeen years experience, and was at the time, April 19, 1920, at work upon a new frame upon an engine which had been shopped for repairs. The frame of an engine is that part to which most of its working parts are attached in one way or another, is very heavy and bears a large portion of the weight of the engine. The plaintiff thus describes the occurrence upon which his action is based:

"I was drilling some new holes in the frame. There were nine holes on each side, and they were one and nine thirty-second inches in diameter. I drilled four and was drilling the fifth one when the accident happened. The drill hung just as it started to go through this hole that I was drilling. I tried to work the drill loose. Of course, when it hangs it stalls the motor and stops. I caught hold of the handles. Usually by pulling up on the motor and giving it a new force it will sometimes pull the drill loose and it will go on cutting then; sometimes it doesn't. If it doesn't, it only tightens the drill more into the metal. I was unable to work it loose in the usual manner. I looked over the frame to see how much of the point of the drill was sticking through. I saw it was just about an eighth of an inch, just through the edge on the outside part of the frame. I took my hammer and hit a lick, and a piece of the drill flew off and struck me in the eye."

[1] It is perfectly apparent that the plaintiff was guilty of gross negligence, for it appears that the hammer with which he struck the point of the drill was a hard steel hammer, which injured the drill and was not intended to be thus used. The proper method of loosening or driving the drill back when his other effort failed, under the circumstances which he describes, was to use what is called a soft hammer—that is, a hammer made of either lead or copper, or both, or of some material softer than steel. The use of such a hammer which is softer than the point of the drill would neither break it nor endanger the mechanic.

The negligence charged is the failure of the company to provide a soft hammer for the plaintiff in connection with his work, or to give him any information as to where such a hammer could be procured. This is denied and the testimony is conflicting on this point.

The declaration contains three counts, one of which alleges that at the time of the injury the plaintiff was engaged in intrastate commerce, another that he was at that time engaged in interstate commerce. The third count alleges that it was the duty of the company to protect the plaintiff against such accidents and casualties as might be reasonably foreseen and prevented, and not to expose him to risks and dangers resulting therefrom or beyond those incident to the employment and within the contemplation of the parties at the time of the contract of service, and especially to instruct the plaintiff, and establish, promulgate and enforce such proper rules and regulations for the work in which he was engaged as to enable the plaintiff to avoid injury, and avers that he was negligently and carelessly furnished with unsafe, insufficient and unsuitable tools, equipment, appliances and instrumentalities for his work.

Whether the plaintiff was engaged in either interstate or intrastate commerce at the time of the accident is to be considered, because if so certain defenses formerly available to the defendant are now by statute denied.

[2] The facts with reference to the engine upon which the plaintiff was working at the time of his injury are thus agreed:

"Engine No. 99, prior to being shopped as herein stated, was an extra passenger engine and ran on the Peninsular, Rivanna and Piedmont districts in Virginia wherever necessary to relieve one of the regular engines. It was shopped April 1, 1920, for general repairs and left the shops May 27, 1920, being out of service two months. The last run this engine made prior to being shopped was on March 25th, when it ran extra from Newport News, Va., to Richmond, Va., handling a supply train for points along the route in the State of Virginia and elsewhere, consisting of a stationery car, two oil cars and one store car. This train had supplies in these cars and came to Richmond, Va., and from Richmond, Va., this train went west on the James River division on March 26th. The stationery was loaded for entire system as far as Cincinnati and is handled by this supply train. In addition to the above cars, they have several box cars in the train loaded with track material, same being loaded at Huntington. The first run engine No. 99 made after being shopped was on May 29th, when it went from Richmond, Va., to Providence Forge, Va., light on a trial trip. On May 30th this engine was put in service on passenger trains 15 and 20, between Newport News, Va., and Richmond, Va. Trains 15 and 20, Peninsular district, carry a full express car and handle express every day except Sunday. This express car stops at Richmond, Va., but through express is transferred at Richmond, Va., from one train to another."

There has been much litigation over the construction of the Federal employer's liability act (U. S. Comp. St. §§8657-8665), especially in the determination of when an injured employee can invoke its provisions—that is, whether or not at the time of his injury he is employed in interstate commerce. It would be a thankless task to undertake to review these authorities, which in the inferior Federal courts are conflicting. The question, so far as involved in this case, must, however, be regarded as settled by an unbroken line of decisions of the Supreme Court of the United States.

[3, 4] In *Shanks* v. *Delaware, Lackawanna & Western R. Co.*, 239 U. S. 556, 60 L. Ed. 436, 36 Sup. Ct. 188, L. R. A. 1916C, 797, it appeared that an employee in a railway machine shop, operated for repairing parts of locomotives which were used both in interstate and intrastate transportation, was injured while taking down and putting into a new location in such shop an overhead countershaft, through which power was to be communicated to machinery used in the shop. It was held that such an employee was not engaged in interstate commerce, within the meaning of the act.

In *Minneapolis & St. Louis R. Co.* v. *Winters*, 242 U. S. 353, 61 L. Ed. 358, 37 Sup. Ct. 170, Ann. Cas. 1918B, 54, it appeared that a machinist's helper, while he was engaged in making repairs upon an engine in a roundhouse which had been used in hauling freight trains carrying both interstate and intrastate freight, and which was used in the same way after the injury, was not then employed in interstate commerce within the meaning of the act. This is there said: "The plaintiff was making repairs upon an engine. This engine 'had been used in the hauling of freight trains over the defendant's line   *   *   which freight trains

hauled both intrastate and interstate commerce, and it was so used after the plaintiff's injury.' The last time before the injury on which the engine was used was on October 18, when it pulled a freight train into Marshall-town, and it was used again on October 21, after the accident, to pull a freight train out from the same place. That is all that we have, and is not sufficient to bring the case under the act. This is not like the matter of repairs upon a road permanently devoted to commerce among the States. An engine, as such, is not permanently devoted to any kind of traffic, and it does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and go on. It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen. At the moment it was not engaged in either. Its character depended on its employment at the time, and not upon remote possibilities or upon accidental later events.''

The principle enforced in the *Winters Case* apparently expresses the deliberate and final judgment of the Supreme Court of the United States upon facts similar to those we have here, for this has certainly been since then twice indicated. The memorandum opinion in *Chicago, Kalamazoo & S. Ry. Co.* v. *Kindlesparker*, 246 U. S. 658, 62 L. Ed. 925, 30 Sup. Ct. 425, reverses the same case below (148 C. C. A. 17, 234 Fed. 1), upon the authority of the *Winters Case, supra.* The recent case of *Industrial Accident Commission of California* v. *Payne, Agent, etc.*, May 29, 1922, 259 U. S. 182, 42 Sup. Ct. 489, 66 L. Ed. 888, grew out of an injury to an employee, who both before and after his injury was en-

gaged in interstate commerce. The facts there were that the engine was placed in the shop for general repairs December 19, 1918, and on February 25, 1919, after working upon it, it was given a trial and again placed in service March 4, 1919. The employee was injured February 1st, the engine at the time being nearly stripped and dismantled. After citing previous cases, this is said: "They pronounce a test and illustrate it. We are called upon to apply it to the present controversy. The Federal act gives redress only for injuries received in interstate commerce. But how determine the commerce? Commerce is movement, and the work and general repair shops of a railroad and those employed in them are accessories to that movement, indeed, are necessary to it, but so are all attached to the railroad company, official, clerical or mechanical. Against such a broad generalization of relation we, however, may instantly pronounce, and successively against lesser ones, until we come to the realization of the employment to the actual operation of the instrumentalities for a distinction between commerce and no commerce. In other words, we are brought to a consideration of degrees, and the test declared, that the employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace State jurisdiction and make applicable the Federal act. And there is a difference in the instrumentalities. In some, the tracks, bridges and roadbed and equipment in actual use, may be said to have definite character and give it to those employed upon them. But equipment out of use, withdrawn for repairs, may or may not partake of that character according to circumstances, and among the circumstances is the time taken for repairs— the duration of the withdrawal from use. Illustrations

readily occur.   There may be only a placement upon a sidetrack or in a roundhouse—the interruption of actual use, and the return to it, being of varying lengths of time, or there may be a removal to the repair and construction shops, a definite withdrawal from service and placement in new relations; the relations of a workshop, its employments and employees having cause in the movements that constitute commerce, but are not immediate to it.   And it is this separation that gives character to the employment, as we have said, as being in or not in commerce.   Such, we think, was the situation of the engine in the present case."

So that, following the final authority upon the question, it is perfectly apparent here that this plaintiff, working upon this engine so withdrawn from commerce, was not engaged in interstate commerce or within the provisions of the Federal act.

[5-8] This being apparent, it follows that his case is controlled by the State law, which has full force and effect.   What then is the State law?   The pertinent statutes are Code, sections 5791, 5792 and 5793.*   Sec-

---

*Section 5791.  Liability of intrastate common carriers by railroads operated by steam for injury to, or death of, employees.—Every common carrier by railroad engaged in intrastate commerce shall be liable in damages to any of its employees suffering injury while he is employed by such carrier in such commerce, and in case of his death, to his personal representative, for such injury or death, resulting in whole or in part from the wrongful act or neglect of any of the officers, agents, servants or employees of such carrier, or by reason of any defect or insufficiency, due to its neglect, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.  If the action be for the death of an employee, sections fifty-seven hundred and eighty-seven, fifty-seven hundred and eighty-eight, fifty-seven hundred and eighty-nine and fifty-seven hundred and ninety, shall apply thereto as far as applicable.  No action shall be maintained under this section, unless it be commenced within one year from the day the cause of action accrued.

Section 5792.  Contributory negligence no bar to recovery; violation of safety appliance acts.—In all actions or motions hereafter brought against any such common carrier to recover damages for personal injuries to any employee, or where such injuries have resulted in his death, the fact that such employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee; and no such employee, who may be injured or killed, shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

Section 5793.  Assumption of risk; violation of safety appliance acts.—In any action brought against any common carrier, under or by virtue of section fifty-seven hundred and ninety-one, to recover damages for injuries to, or death of, any of its employees, the knowledge of any employee injured or killed of the defective or unsafe character or condition of any machinery, ways, appliances, or structures of such carrier, shall not of itself be a bar to recovery for any injury or death caused thereby, nor shall such employee be held to have assumed the risk of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury, or death of such employee.

tion 5791 follows quite closely the language of the Federal Employer's liability act. The controlling language having been taken therefrom, this court will adopt the construction placed upon apposite language by the Supreme Court of the United States, not only because of our high respect for that tribunal, but also because it accords with our own convictions. Furthermore, the general rule is that when the General Assembly adopts a statute which has been previously enacted by another sovereignty and it has been construed by the courts of that sovereignty, then such previous construction of the statute is held to be also adopted. This being true, it follows that at the time this plaintiff was injured, he was not engaged in intrastate commerce (or transportation service) within the meaning of the Virginia statute, and hence he cannot invoke either section 5791 or 5793, which applies to actions brought under section 5791.

It is argued with some plausibility and much insistence that inasmuch as under the Federal decisions it appears that this plaintiff was not engaged in interstate commerce, and hence that the State law controls, it therefore follows that he was engaged in intrastate commerce, because there are only two kinds of commerce. The answer to this is obvious, and has already been indicated. He was not engaged in either kind of commerce within the meaning of either of the statutes. Both statutes express the limitation imposed, but it would be difficult to apply such limitation if any other construction were adopted. There are few occupations which are not intimately connected with commerce. Certainly every machine shop and manufacturing enterprise is engaged in producing articles which are destined to be sold or used in connection with or transported in commerce. As used in *these statutes*, however,

the language means, as has been so clearly pointed out by the Supreme Court of the United States, that there must be some direct connection with transportation in commerce. Work upon a railroad track or bridge already devoted to and used in commerce is clearly embraced in the act. Work upon an engine which is temporarily held either upon a track or in a shop while the train which it has been drawing is also held, until such engine can be repaired so that both can continue the journey, is so directly connected with transportation in commerce as to come within the meaning of the acts. An instrumentality of commerce, however, like an engine, which has been withdrawn from service for an indefinite time, until it can be repaired and thereafter again devoted to such transportation service, is like an engine in the shop of its original builder which, though intended for, has not yet been devoted to transportation service.

Under the facts of this case, then, the plaintiff must recover, if at all, under the third count of his declaration.

It is insisted by the company that both the defenses of contributory negligence and assumption of risk are open to it, and that the trial court erred in holding otherwise. This brings us to the consideration of the other section, 5792.

[9-11] This section is substantially a copy of section 2 of the act approved March 21, 1916 (Acts 1916, p. 763). There is no such qualification therein as appears in this preceding section (5791) referring specifically to actions for injuries to employees while engaged in intrastate commerce, nor does any such qualification appear in the original act. Section 5792 includes in terms all actions or motions against common carriers by railroad who are engaged in intrastate commerce, applies without quali-

fication to actions for all injuries which may be suffered by any of its employees, and expressly provides that contributory negligence shall no longer bar a recovery in such cases, but in lieu of such bar that the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. It is argued that this section, both in the original act and in the Code, should be construed together with the preceding section 5791 and the following section 5793; and that so construed all three refer to injuries suffered while the employees are engaged in intrastate commerce. It is observed, however, that although section 5793 expressly refers to actions brought under section 5791, section 5792 makes no such reference, and in order to give it this construction we must imply such a reference and do violence to its language. The use of limiting language both in the preceding (5791) and succeeding (5793) section, and its omission from this section, is the clearest indication which could possibly have been given that no such qualification should be imported into section 5792. That the General Assembly, in the original act, intended to impose no such limitation is manifest from the language of the act itself, for that imposes the liability upon every railroad, whose motive power is steam, engaged in intrastate commerce, without expressing or adding the limiting condition which section 5791 imposes, namely, that such injury must have been suffered by the employee while he also is engaged in such commerce. Under the original act, then, it seems clear that the defense of contributory negligence as an absolute bar was denied in all such cases, and in the general revival of the Code the intent to change the previous statute is not lightly to be inferred. Such an intent must clearly appear. That such a purpose to change the first and third sections of the previous act is,

manifest from the language used in sections 5791 and 5793, but it seems to us equally manifest that it was not intended thereby to change the second section of the act, now section 5792.

We conclude, therefore, that as the law now is in Virginia, expressed in section 5792, contributory negligence is no longer an absolute bar to an action by an injured employee of any common carrier by railroad, whose motive power is steam, engaged in intrastate commerce. The test under this section as to this plaintiff is not whether at the time of his injury the employee was engaged in intrastate commerce, but merely whether the defendant carrier is engaged in such commerce.

[12] Among the errors assigned is the refusal of the court to give an instruction on contributory negligence as applicable to the facts of this case. That instruction reads thus:

"The court instructs the jury if they believe from the evidence that the plaintiff was operating a drill upon the occasion of his injury and that the drill became jammed in the engine frame through which the plaintiff was drilling a hole, and that the plaintiff in order to dislodge the drill struck it with a hard steel hammer, causing a piece of steel to fly off and injure the plaintiff's eye, and that the plaintiff knew, or by the exercise of ordinary care should have known, that this was a dangerous way of extricating the drill, and if the jury shall further believe from the evidence that there were other ways of doing the work which were reasonably safe of which the plaintiff knew or could have discovered by the exercise of ordinary care, none of which the plaintiff adopted or attempted to adopt, then the plaintiff was guilty of contributory negligence."

This instruction is carefully drawn and is fully justi-

fied by the testimony, even that of the plaintiff himself. If there be any sufficient reason for its refusal, it must be found in other instructions which cover the point. We look in vain for any such other instruction which does.   While the instructions granted at the instance of the plaintiff in general terms authorize the jury, if they find the plaintiff guilty of contributory negligence, to reduce the damages proportionately, none of them are so drawn as to meet the particular facts of this case. We are clear in our view that the refusal of this instruction constitutes harmful error.

The company also set up the defense of assumed risk.   If this section could be sustained upon the ground that it accrued to an employee at the time engaged in intrastate commerce, then it would be necessary to consider whether the defense of assumed risk would be available to the company.   *Seaboard Air Line R. Co.* v. *Horton*, 233 U. S. 492, 58 L. Ed. 1062, 34 Sup. Ct. 635, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; 47 L. R. A. (N. S.) 62; L. R. A. 1915C, 69; R. C. L. 830; *Edward L. Houx* v. *Union Construction Co., Inc.*, 107 Me. 101, 30 L. R. A. (N. S.) 800; *Houston's Adm'x* v. *Seaboard A. L. Ry.*, 123 Va. 290, 96 S. W. 270.

[13] Certainly there is nothing in section 5792 which denies the defense of assumed risk, though to a limited extent it is denied by section 5793 in actions brought under section 5791.

[14] The plaintiff himself showed by his own testimony that he did not seek or ask for a soft hammer at the time of the occurrence.   He says that about thirty days before that time he had need for one, made inquiry therefor and that it was not furnished, and that when he returned to work about four months thereafter he also inquired for one and could not find any. He shows that he had full knowledge that a soft ham-

mer is the customary tool to use in such an exigency, and that under the circumstances which confronted him a hammer of some sort was necessary. He shows clearly that he knew the danger of using a hard hammer under such conditions, and imputes negligence to the company because he never had been supplied with a soft hammer. These facts present a perfect case for the application of the assumed risk doctrine. There was no secret or lurking danger, and there was no order to do the dangerous act which directly caused the injury. Here is an experienced machinist, knowing, according to his own testimony, that he had no soft hammer at the moment available for his use, who continues his work without a complaint or protest, and when the occasion arises when such a hammer is needed, makes no application therefor, although it is shown that it is a very simple tool which can be manufactured and be ready for use in five or ten minutes. He proceeds to do a thing so obviously dangerous as to strike the point of a steel drill with a hard steel hammer. That he fully appreciated the danger to himself is shown not only inferentially in his testimony, but expressly by his replies to these questions: "Why did you want a soft hammer on this occasion?" "I wanted it to prevent myself from being injured by hitting that drill." Q. "Would it have prevented the accident?" A. "Yes, sir."

We have then to consider a case in which the plaintiff, with as complete knowledge of the danger as the master could possibly have, deliberately continues to work with tools which he now claims to have been dangerous, and without making any complaint thereof. Finding it necessary to extricate the steel drill, he proceeds, without the knowledge of the master and without any order, in the absence of any emergency requiring immediate

action, without any sudden peril to himself, with ample time to proceed safely, and possessing expert knowledge, proceeds of his own volition to take the chance and assume the risk of using an improper tool in doing the act which was to him so manifestly dangerous.

[15] The company, relying upon these circumstances, asked the trial court to give instruction No. 1:

"The court instructs the jury that even though they may believe from the evidence that drills such as the plaintiff was operating were liable to jam and that a soft hammer was the proper appliance or tool to be used in extricating the said drill from its jammed condition, the defendant's duty in connection therewith was performed if it had such hammers in an accessible place where the plaintiff could obtain them upon inquiry, and if the jury shall believe from the evidence that the drill which the plaintiff was using when he was injured was jammed, on the occasion of his injury, and that the plaintiff could have obtained a soft hammer upon application to his gang foreman or other person in authority, that the plaintiff, without asking or looking for a soft hammer, proceeded to use a hard hammer for the purpose of driving out the drill and that in consequence thereof the plaintiff was injured, then the jury must find for the defendant."

This instruction was modified by striking out the words "upon inquiry" in the clause reading, "the defendant's duty in connection therewith was performed if it had such hammers in an accessible place where the plaintiff could have obtained them upon inquiry," and substituting therefor, "the defendant's duty in connection therewith was performed if it had such hammers in an accessible place where the plaintiff could obtain them *and by promulgating and making known to the employees, including the plaintiff, the manner in*

*which such* tools could be obtained." It also modified the subsequent clause therein reading, "and the plaintiff could have obtained a soft hammer upon application," etc., and substituted, "and the plaintiff could have obtained *in the manner provided in said rule and made* known to him a soft hammer upon application," etc. So that the court denied the defense indicated by the instruction, except upon condition that there had been rules promulgated showing how such tools could be obtained. We think that the instruction, as originally offered, was correct, and that the modification tended to confuse and mislead the jury. The plaintiff had been working in the shop for ten months. He had received the tools which were ususal and necessary for his customary work. He knew how to seek for any others which might be needed during the course of his. work.

There is nothing in the record to indicate that formal rules about so simple a matter were necessary or even. expedient. *Moore Lime Co.* v. *Richardson*, 95 Va. 326,. 28 S. E. 334, 64 Am. St. Rep. 785; *Norfolk & Western Ry. Co.* v. *Graham*, 96 Va. 434, 31 S. E. 604. The soft. hammer needed was a tool which was appropriate only for definite purposes, as and when the occasion for its use might arise. It was not such a tool as was intended to be always carried around by him for customary use.

This error might, however, be considered as harmless but for the fact that the court refused instruction No. 2, reading thus:

"The court instructs the jury that if they believe from the evidence that the plaintiff was operating a drill upon the occasion of his injury and that the drill became jammed in the engine frame through which the plaintiff was drilling a hole, and that the plaintiff in

order to dislodge the drill struck it with a hard steel hammer, causing a piece of steel to fly off and injure the plaintiff's eye, and that the plaintiff knew or ought to have known that such a hammer was not the proper appliance to be used for this purpose and that the same was liable to cause injury both to the operator and the drill, then the plaintiff assumed the risk of the injury he received and they must find for the defendant."

[16] This instruction clearly and simply brought to the attention of the jury the defense of assumed risk growing out of the voluntary use of a tool known to the plaintiff to be improper, as well as dangerous. Our judgment, as has been indicated, is that the court erred in refusing to grant this instruction, because even if there had been a conflict upon the facts thereby suggested, the company would have been entitled to it. In this case, however, there was no conflict, and every fact which is suggested by the instruction is shown by the testimony of the plaintiff himself.

There are other exceptions to two instructions given for the plaintiff in which they are told that the damages awarded the plaintiff should not exceed the sum of $15,000. As we have heretofore indicated, such instructions have been criticised. *Norfolk & Western Ry. Co.* v. *Marpole*, 97 Va. 599, 34 S. E. 462; *Newport News, etc., Co.* v. *Beaumeister*, 104 Va. 748, 52 S. E. 627. If any allusion is to be made by the trial court to the extreme amount which the jury may allow in such cases, it should appear clearly that the only reason the amount is specified is because that is the sum which is claimed by the plaintiff in his declaration.

Our judgment upon the whole case is that the trial court erred in the particulars indicated and also in its refusal to set aside the verdict. The primary negligence charged against the defendant has slight support

in the testimony and was not the efficient or direct cause of the plaintiff's injury.    His own voluntary act was the direct cause thereof, and there was no intervening, supervening, or efficient cause, except his own rash and unnecessary action.

[18] We regard the defense of assumed risk as established by the plaintiff's own evidence, and that being true our conclusion is to enter here a final judgment in favor of the defendant.

*Reversed.*