174 So. 163

**FLUITT v. NEW ORLEANS, T. & M. RY. CO. et al.**

No. 34176.

March 29, 1937.

S. W. Plauche and C. V. Pattison, both of Lake Charles, for relator.

Milling, Godchaux, Saal & Milling, of New Orleans, and Frank E. Powell, of De Ridder, for respondents.

HIGGINS, Justice.

Plaintiff sued the New Orleans, Texas & Mexico Railway Company for compensation of $20 per week for 400 weeks for permanent disabilities said to have resulted from injuries received by him in an accident on May 22, 1933, while employed in the company's shops at De Quincy, La. Before answer was filed, plaintiff filed a supplemental and amended petition, alleging that at the time of the accident L. W. Baldwin and Guy A. Thompson, by virtue of appointment by the federal court of the Eastern District of Missouri, in bankruptcy proceedings, were operating the railway company in their capacity as trustees, and made them parties defendant.

The trustees answered, admitting that at the time of the accident the plaintiff was their employee, but denied that he was an employee of the railway company. They also denied liability, and denied that the plaintiff was permanently injured as

a result of the accident, and further pleaded that at the time he was injured he was employed by an interstate carrier in interstate commerce and was injured while performing services in interstate commerce and his claim for damages arose exclusively under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. and not the Workmen's Compensation Law of Louisiana (Act No. 20 of 1914, as amended). The defendants also pleaded a compromise settlement by them with the plaintiff in the sum of $414.12, and a release given by him to them, relieving them of all further liability.

The New Orleans, Texas & Mexico Railway Company filed an exception of no cause of action on the ground that at the time of the accident the plaintiff was not in its employ, but was in the employ of the trustees. In the alternative, the railway company filed an answer, which was similar to the one filed by the trustees.

As a result of the defendants' averment of compromise and release, the plaintiff filed a second supplemental petition, praying for additional compensation for a lump-sum settlement of compensation made without the approval of the court and with a discount of more than eight per cent. in contravention of the provisions of subsection 9 of section 8 of Act No. 242 of 1928 (page 362), amending paragraph 9 of section 8 of Act No. 85 of the Regular Session of the Legislature of 1926, and Act No. 20 of the Regular Session of the General Assembly for the year 1914. The defendants answered this supplemental petition, denying that the compromise was a lump-sum settlement of

compensation, and averring that it was a valid compromise of plaintiff's claims for damages under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

When the case was called for trial, the exception of no cause of action was sustained and the suit dismissed as to the railway company. Plaintiff did not appeal from that judgment.

Thereafter, the case was litigated on the merits between the plaintiff and the trustees, and the suit was dismissed by the trial judge, who ruled:

"Considering all the circumstances in this case, it must be held that the engine which plaintiff was assisting in repairing at the time he was injured was at that time an instrumentality of interstate commerce, and therefore the plaintiff was engaged at the time of his injury, in interstate commerce."

The Court of Appeal affirmed the judgment on the same ground. 169 So. 803. A rehearing was refused, and plaintiff applied to this court for a writ of certiorari, which was granted, and the case is now before us for review.

The undisputed facts pertaining to whether or not plaintiff was engaged in interstate commerce within the purview of the Employers' Liability Act so as to preclude him from bringing this action under the Workmen's Compensation Law of Louisiana, as admitted in the pleadings and proved on the trial, are as follows:

The plaintiff was employed by the defendant trustees as the operator of a portable electric crane, resembling a large motortruck, in the roundhouse and repair

shop of the railway company at De Quincy; that his duties consisted of operating the crane in moving heavy objects in and around the roundhouse and sometimes in the shop yards; that on May 22, 1932, the plaintiff was instructed to pick up with the crane an engine tire weighing about 400 pounds, which was in the shop yard, and place it alongside a locomotive, which was in the roundhouse for monthly inspection and repairs, as required by the rules of the Interstate Commerce Commission, this passenger engine having been placed in the roundhouse at the end of the regular interstate run at noon on May 21, 1933, and, after repairs, went out on an interstate run at 4:30 p. m. on May 23, 1933; that this locomotive at one time had been used in interstate freight service; that, after backing the electric crane out of the shop to pick up the engine tire, the crane collided with a coal car, which was not in motion, and the plaintiff was crushed between the car and the crane; that the locomotive was out of service at the time and was in the roundhouse for repairs, after having completed its interstate run; and that the plaintiff's sole duty with reference to it consisted of the assignment to lay the tire alongside the engine, he having nothing to do with any repair work to be done on it.

The pertinent part of section 1 of the Federal Employers' Liability Act reads as follows:

"Every common carrier by railroad while engaging in commerce between any of the several States or Territories * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." U. S. Code, title 45, chapter 2, § 1, 45 U.S.C.A. § 51, Act of April 22, 1908, c. 149, § 1, 35 Stat. 65.

This statute is clearly recognized by the Louisiana Workmen's Compensation Law, section 30 of Act No. 20 of 1914 (as amended by Act No. 244 of 1920), which expressly provides that it does not cover employees engaged in interstate or foreign commerce.

■ In order to hold that plaintiff's cause of action is governed by the federal statute, it must be found that plaintiff was engaged either in interstate transportation, or in work so closely related to such transportation as to be practically a part of it. Chicago & North Western Railway Co. v. Bolle, 284 U.S. 74, 52 S. Ct. 59, 76 L.Ed. 173; Shanks v. Delaware, Lackawanna & Western R. R. Co., 239 U.S. 556, 36 S.Ct. 188, 189, 60 L.Ed. 436, L.R.A.1916C, 797.

In the case of Chicago & North Western Railway Co. v. Bolle, supra, the United States Supreme Court clearly distinguishes between "interstate commerce" and "interstate transportation" as used in the federal statute, as follows:

"It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation, or in work so closely related to such transportation as to be practically a part of it."

It is clear that at the time the plaintiff was accidentally injured he was not actually engaged in interstate transportation. In order to hold that his cause of action comes under the federal statute, it is necessary to find that he was engaged in work so closely related to interstate transportation as to be practically a part of it.

One of the earliest cases bearing on this question is that of Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 903, 59 L.Ed. 1397, 1399. In that case, the facts and findings of the United States Supreme Court appear from the following excerpts taken therefrom:

"The complaint charged that the injuries were received while the plaintiff was employed in the defendant's colliery in Luzerne county, Pennsylvania. As to the manner of injury, the complaint averred that while the plaintiff was in the employ of the defendant in its colliery, and was engaged in and about the performance of his duties, preparing and setting off a charge of dynamite for the purpose of blasting coal, the explosive gases which accumulated at the place where plaintiff was working suddenly ignited and exploded, causing a squib attached to the charge of dynamite to catch fire and to be immediately consumed, so that the charge of dynamite was exploded and discharged, and as a result thereof the plaintiff received great, severe, and permanent injuries. * * *

"The amended complaint added certain allegations wherein it was alleged that the defendant, for the purpose of its railroad, owned, managed, and operated a certain mine or colliery known as the 'Pettibone' colliery in the state of Pennsylvania, in which plaintiff was employed at the time of the injury, and where, at all of the times covered by the complaint, *the defendant did and still does mine and prepare anthracite coal for use in its locomotives and engines and other equipment used in its business as a common carrier in interstate commerce.* That at the time of receiving the injury plaintiff was employed by the defendant at said mine or colliery in such interstate commerce. The amended complaint did not change the allegations as to the manner in which plaintiff received his injuries. The defendant took issue upon the amended complaint and the case came on

for trial. *In the course of the trial, during examination of a witness, while evidence was being offered to show the disposition of the coal mined, counsel for defendant stated that it used the coal mined in its locomotives in interstate commerce. He said that as a matter of fact and as a matter of law coal which plaintiff mined was used in that way, and that 'we are engaged in interstate commerce.'* * * *

"The averments of the complaint as to the manner of the receiving of the injury by plaintiff showed conclusively that it did not occur in interstate commerce. *The mere fact that the coal might be or was intended to be used in the conduct of interstate commerce after the same was mined and transported did not make the injury one received by the plaintiff while he was engaged in interstate commerce. The injury happening when plaintiff was preparing to mine the coal was not an injury happening in interstate commerce, and the defendant was not then carrying on interstate commerce,—facts essential to recovery under the employers' liability act.*" (Italics ours.)

In the case of Shanks v. Delaware, Lackawanna & Western R. R. Co., supra, the United States Supreme Court clearly sets out the limits of the Federal Employers' Liability Act in the following words:

"Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, *we think it speaks of interstate commerce, not in a technical legal sense, but in a practical* one better suited to the occasion (see Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518, 525), and that the true test of employment in such commerce in the sense intended is, *Was the employee, at the time of the injury engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?* * * *

"Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car or other instrument *then in use in such transportation.* What he was doing was altering the location of a fixture in a machine shop. *The connection between the fixture and interstate transportation was remote at best,* for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation. This, we think, demonstrates that the work in which Shanks was engaged, *like that of the coal miner in the Yurkonis Case, was too remote from interstate transportation to be practically a part of it, and therefore that he was not employed in interstate commerce within the meaning of the employers' liability act.*" (Italics ours.)

In Chicago, B. & Q. R. R. Co. v. Harrington, 241 U.S. 177, 36 S.Ct. 517, 60 L.Ed. 941, Harrington was injured while working with a switching crew, switching cars loaded with coal from a storage track to be placed in bins or chutes and supplied, as needed, to locomotives of all classes, some of which were engaged, or

about to be engaged, in interstate and others in intrastate traffic. While so engaged, he sustained injury resulting in his death, and his widow brought suit under the state law, and the defendant railroad company interposed the defense that the decedent was engaged in interstate commerce at the time of the accident, and that the case was governed by the Federal Employers' Liability Act. In passing upon this question, the court conceded that none of the locomotives belonging to the defendant railroad were set apart for service only in intrastate commerce. In holding that the federal statute did not apply, the court said:

"So, also, as the question is with respect to the employment of the decedent at the time of the injury (Illinois C. R. Co. v. Behrens, 233 U.S. 473, 478, 34 S.Ct. 646, 58 L.Ed. 1051, 1055, Ann.Cas.1914C, 163), it is not important whether he had previously been engaged in ·interstate commerce, or that it was contemplated that he would be so engaged after his immediate duty had been performed. That duty was solely in connection with the removal of the coal from the storage tracks to the coal shed, or chutes, and the only ground for invoking the Federal act is that the coal thus placed was to be used by locomotives in interstate hauls.

"As we have pointed out, the Federal act speaks of interstate commerce in a practical sense suited to the occasion, and 'the true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury engaged in interstate transportation, or in work so closely related to it as to be prac-

tically a part of it?' Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 558, 36 S. Ct. 188, 60 L.Ed. 436, 438 [L.R.A.1916C, 797], and cases there cited. *Manifestly, there was no such close or direct relation to interstate transportation in the taking of the coal to the coal chutes. This was nothing more than the putting of the coal supply in a convenient place from which it could be taken as required for use.* It has been held that an employee of the carrier, while he is mining coal in the carrier's colliery, intended to be used by its interstate locomotives, is not engaged in interstate commerce within the meaning of the Federal act (Delaware, L. & W. R. Co. v. Yurkonis, 238 U.S. 439, 35 S. Ct. 902, 59 L.Ed. 1397), and there is no distinction in principle between the two cases." (Italics ours.)

In the case of Illinois Central, etc. v. Cousins, 241 U.S. 641, 36 S.Ct. 446, 60 L. Ed. 1216, the injured employee brought suit in the state court of Minnesota under the state statute for injuries received while wheeling coal to heat the shop within which employees were at work, repairing cars which had been, and were to be, used in interstate traffic. The state court held that the case was governed by the federal statute, but upon writ of error to the United States Supreme Court the decision was reversed in the following per curiam decision (241 U.S. 641, 36 S.Ct. 446, 60 L.Ed. 1216):

"Judgment reversed with costs upon the authority of Delaware, L. & W. Ry. Company v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397; Shanks v. Delaware,

L. & W. R. Co., 239 U.S. 556, 36 S.Ct. 188 [60 L.Ed. 436 [L.R.A.1916C, 797]."

In Erie Railway Co., etc., v. Welsh, 242 U.S. 303, 37 S.Ct. 116, 117, 61 L.Ed. 319, the facts and findings are set out in the following excerpts from the decision:

"The rulings of the trial court were sustained by the supreme court (and presumably by the circuit court) upon the ground that, upon the undisputed evidence, plaintiff was not at the time employed in interstate commerce. As to this question, there was testimony tending to show that defendant was a common carrier by rail engaged in commerce between the states, and that plaintiff was and for sometime had been a yard conductor engaged in night duty at its Brier Hill, yard, a mile or more west of Youngstown; that he performed miscellaneous services in the way of shifting cars and breaking up and making up trains, under orders of the yardmaster, and had to apply frequently to the latter for such orders; that when any orders thus given had been performed, or had 'run out,' he usually reported at the yardmaster's office for further orders; that on the night in question plaintiff, with a yard crew, took a freight car loaded with merchandise destined to a point without the state, and a caboose which, so far as appears, was not to go beyond the limits of the state, from the Brier Hill yard eastwardly to the 'F. D. yard' in Youngstown, where the freight car was placed upon a siding, so that it might be made up into a train by another crew; that they then took the caboose a short distance farther and placed it upon another siding; that they

next took the engine to a water plug and took on water, and then returned with it to the Brier Hill yard; that on this return journey the engine was slowed down near the yardmaster's office, which is at the easterly end of that yard, so as to enable Welsh to report for further orders, all previous orders having been executed; and that the injury was received while he was attempting to alight for that purpose.

"It was in evidence, also, that the orders plaintiff would have received had he not been injured on his way to the yardmaster's office would have required him immediately to make up an interstate train. Upon the strength of this it is argued that his act at the moment of his injury partook of the nature of the work that, but for the accidental interruption, he would have been called upon to perform. In our opinion, this view is untenable. *By the terms of the Employers' Liability Act the true test is the nature of the work being done at the time of the injury, and the mere expectation that plaintiff would presently be called upon to perform a task in interstate commerce is not sufficient to bring the case within the act.* Illinois C. R. Co. v. Behrens, 233 U.S. 473, 478, 34 S.Ct. 646, 58 L.Ed. 1051, 1055, Ann.Cas.1914C, 163, 10 N.C.C. A. 153." (Italics ours.)

In the case of New York Central R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 248, 61 L.Ed. 667, L.R.A.1917D, 1, Ann. Cas.1917D, 629, White's widow brought suit under the Workmen's Compensation Law of New York to recover compensation from the railroad company for the accidental death of her husband arising

out of and in the course of his employment by that company. The railroad company urged the defense that its liability if any, was defined and limited exclusively by the provisions of the Federal Employers' Liability Act. In overruling this contention, the court said:

"The first point assumes that the deceased was employed in interstate commerce at the time he received the fatal injuries. According to the record, he was a night watchman, charged with the duty of guarding tools and materials intended to be used in the construction of a new station and new tracks upon a line of interstate railroad. The Commission found, upon evidence fully warranting the finding, that he was on duty at the time, and at a place not outside of the limits prescribed for the performance of his duties; that he was not engaged in interstate commerce; and that the injury received by him and resulting in his death was an accidental injury arising out of and in the course of his employment. ·

"The admitted fact that the new station and tracks were designed for use, when finished, in interstate commerce, does not bring the case within the Federal act. The test is, 'Was the employee at the time of the injury engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?' Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 558, 36 S.Ct. 188, 60 L.Ed. 436, 438, .L.R.A.1916C, 797." (Italics ours.)

In the case of Hines v. Industrial Accident Commission, 184 Cal. 1, 192 P. 859, 864, 14 A.L.R. 720, the Supreme Court of California had for consideration an application of Walker D. Hines, as Director General of Railroads, to reverse an award of the Industrial Accident Commission against him in favor of respondents as compensation for the death of one Angelo Brizzolara. It appeared that at the time of said injury and death the said Angelo Brizzolara was engaged in making repairs upon a switch engine which had been temporarily withdrawn from service therefor; that the employee was injured while adjusting brakes upon the switch engine. The Director General contended that the case was governed by the Federal Employers' Liability Act, but the court, in a lengthy decision, in which practically every case which had been previously decided bearing on this question was reviewed, overruled this contention in the following words:

"But where the employee's work was only remotely connected with interstate commerce, as in the Yurkonis, Shanks, Harrington, Barlow [(Lehigh Valley R. Co. v. Barlow), 244 U.S. 183, 37 S.Ct. 515, 61 L.Ed. 1070], and Branson [(B. & O. R. Co. v. Branson), 242 U.S. 623, 37 S. Ct. 244, 61 L.Ed. 534] Cases; or where the employee had completed a task which involved interstate traffic, and had not yet commenced a new task, as in the Welsh Case; or where the instrumentality upon which the employee was working was, at the time of the injury, neither engaged in, nor loaded with, interstate traffic, as in the Winters Case [(Minneapolis & St. L. R. Co. v. Winters), 242 U.S. 353, 37 S.Ct. 170, 61 L.Ed. 358, Ann.Cas.1918B, 54], then compensation may be awarded under a state compensation act. As was-

said by this court in the Butler case [(Southern Pac. Co. v. Ind. Acc. Comm.), 178 Cal. 20, 171 P. 1071]:

" 'The decisive consideration is always the closeness or remoteness of the particular work, as related to interstate transportation.'

"Applying these principles to the facts herein, we think that, at the time Brizzolara received the injury which caused his death he was not engaged in interstate commerce. The engine which he was repairing was not used exclusively in such commerce. Indeed, as was said in the Winters Case:.

" 'An engine as such is not permanently devoted to any kind of traffic, and it does not appear that this engine was destined * * * to anything more definite than such business as it might be needed for.'

*"It had been withdrawn from all traffic. To paraphrase the language of the Harrington Case, it is not important whether the engine had previously been engaged in interstate commerce or that it was contemplated that it would be so engaged after this immediate duty had been performed.* And this further excerpt from the opinion in the Winters Case is pertinent:

" 'Its character as an instrument of commerce depended on its employment at the time, not upon remote probabilities or upon accidental later events.' " (Italics ours.)

In the case of Baltimore & Ohio R. R. Co. v. Branson, 242 U.S. 623, 37 S.Ct. 244, 61 L.Ed. 534, Branson, in the state court of Maryland, brought suit against the railroad company for injuries sustained by him while engaged in the painting of cars and engines of the defendant company, used by it in the transportation of commodities and commerce through and between the States (interstate commerce exclusively). He brought the suit under the provisions of the Federal Employers' Liability Act, and the defendant railroad company interposed the defense that the case was not governed by the federal statute. The state court (128 Md. 678, 98 A. 225) overruled the railroad company's contention, saying:

"The declaration states a case in which an employee of an interstate common carrier by rail suffered an injury as the result of the negligence of his employer, and we see no reason, upon grounds of public policy or otherwise, why the suit should not be maintained if the plaintiff was at the time engaged in interstate commerce work.

"Was he so engaged at the time he suffered the injury? The declaration alleged that the plaintiff was engaged in the painting of cars and engines of the defendant company used by it in the transporting of commodities and commerce through and between the states, and that at the time of the injuries complained of, and for a period of 11 months prior thereto, he had been using the paint gun in painting the engines and cars of the defendant used in interstate transportation, and that while so engaged he suffered the injuries complained of as a result of the negligent omission of duty stated in the declaration. Engines and cars are necessary instrumentalities in

the business of interstate commerce, and it is the duty of the carrier to keep them in safe condition and proper repair. Without paint the engines would corrode and the woodwork of the cars decay. The work of painting the engines and cars would seem to have a reasonable and substantial relation to interstate commerce."

On writ of error in the United States Supreme Court, the above decision of the state court was reversed in the following per curiam decision (242 U.S. 623, 625, 37 S.Ct. 244, 61 L.Ed. 534):

"*Judgment reversed with costs upon the authority of Delaware, L. & W. R. Company v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397; Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 36 S.Ct. 188, 60 L.Ed. 436, L.R.A.1916C, 797; Chicago, B. & Q. R. Co. v. Harrington, 241 U.S. 177, 180, 36 S.Ct. 517, 60 L.Ed. 941, 942, 11 N.C.C.A. 992; Minneapolis & St. L. R. Co. v. Winters, 242 U.S. 353, [358] 37 S.Ct. 170, 61 L.Ed. 358 [Ann.Cas. 1918B, 54].*" (Italics ours.)

The test laid down and applied in the cases above cited has been adopted in the state of Louisiana in .the case of Dupuis v. Louisiana Ry. & Navigation Co., 155 La. 953, 99 So. 709, 711, in which the court said:

"*When it is considered that the deceased was merely engaged in unloading piling from a car, and that his immediate employment would have ended with the unloading of the piling, the facts of the case bring it within the rule announced in C., B. & Q. R. Co. v. Harrington, 241 U.S. 177, 36 S.Ct. 517, 60 L.Ed. 941.*

"The specific work in which a railroad employee is engaged at the time he is injured is the test." (Italics ours.)

In the case of Minneapolis & St. Louis R. R. Co. v. Winters, 242 U.S. 353, 37 S.Ct. 170, 171, 61 L.Ed. 358, Ann.Cas. 1918B, 54, Mr. Justice Holmes stated:

"The agreed statement is embraced in a few words. The plaintiff was making repairs upon an engine. This engine 'had been used in the hauling of freight trains over the defendant's line * * * which freight trains hauled both intrastate and interstate commerce, and it was so used after the plaintiff's injury.' The last time before the injury on which the engine was used was on October 18, when it pulled a freight train into Marshalltown, and it was used again on October 21, after the accident, to pull a freight train out from the same place. That is all that we have, and is not sufficient to bring the case under the act. *This is not like the matter of repairs upon a road permanently devoted to commerce among the states. An engine, as such, is not permanently devoted to any kind of traffic, and it does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and go on. It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen. At the moment it was not engaged in either. Its character as an instrument of commerce depended on its employment at the time, not upon remote*

*probabilities or upon accidental later events.*" (Italics ours.)

There is similarity between the Winters Case and the case at bar. In both, the time for making the repairs was about the same; the class of repairs apparently the same. In both, the engine had completed an interstate run, and engaged in an interstate run after the completion of the repairs. *Yet, the court in the Winters Case held that the injured employee who was making the repairs of this engine was not engaged in interstate commerce. Moreover, the Winters Case likewise repudiated the attempted classification of repairs into "incidental repairs" and "general repairs."*

The Supreme Court of the United States in the case of New York, N. H. & H. R. Co. v. Bezue, 284 U.S. 415, 52 S. Ct. 205, 76 L.Ed. 370, 77 A.L.R. 1370, rejected the railway company's artificial classification of repairs.

The injured employee had repaired an engine which had been previously used in interstate commerce, but the court held that he was not engaged in interstate commerce, basing its findings on the Yurkonis Case, the Harrington Case, the Cousins Case, the White Case, and the Bolle Case, cited supra.

In Chicago, K. & S. R. R. Co. v. Kindlesparker (C.C.A.) 234 F. 1, plaintiff was injured while actually repairing an engine destined for use and previously and subsequently used in interstate commerce, but not actually in use at the time, because repairs were being made. The Circuit Court of Appeals of the Sixth

Circuit held that the locomotive was an instrument of interstate commerce at the time of the repairs and the accident, and therefore the federal act was applicable. But the Supreme Court of the United States in a per curiam decision (246 U. S. 657, 38 S.Ct. 425, 62 L.Ed. 925) reversed the judgment in the following language:

"Judgment reversed with costs, and case remanded to the District Court of the United States for the Western District of Michigan for further proceedings, upon the authority of Minneapolis & St. L. R. Co. v. Winters, 242 U.S. 353, 37 S.Ct. 170, 61 L.Ed. 358 [Ann.Cas.1918B, 54]."

■ From the above authorities, it appears that, unless the instrument used in transportation is engaged in or dedicated exclusively to interstate commerce at the time of the accident, even though the repairman works directly on it, the Federal Employers' Liability Act does not apply; and that, even where the instrument used in transportation is engaged exclusively in interstate commerce, if the services rendered or the work performed with reference to it is remote, accessory, or auxiliary, then the Federal Employers' Liability Act is inapplicable and the case is governed by the State Compensation Law. So, in the case of the injured employee who was putting coal in a convenient place from which it could be taken as required for use, his work had no such close or direct relation to interstate transportation in the carrying of goods or passengers as to be practically a part of it. The same rule was applied in similar cases hereinabove cited.

The Supreme Court of the United States found it necessary to announce this rule of interpretation, because there is some causal or remote connection between the work or services performed by a great many individuals and interstate commerce, but their work or service is not so closely identified with transportation as to be a part of interstate commerce.

■ Plaintiff operated the electric crane which was in no way connected with the locomotive in question, the instrument used in interstate commerce. The crane was used to place heavy material at convenient places for all purely local purposes and for the repair of instruments of intrastate as well as interstate transportation. The tire he was going to get at the time had not been in any way identified with interstate transportation or commerce, since it could have been used either on a locomotive engaged in interstate as well as intrastate commerce. It must be conceded that plaintiff's services in no way directly affected the locomotive, since he was neither the repairman nor the repairman's assistant or helper. His work was purely accessory or auxiliary as far as interstate commerce or transportation is concerned, and is therefore too remote to be classified as so closely identified with interstate commerce or transportation as to form a part of it.

Learned counsel for the defendants have referred us to a number of cases where workmen have been injured while repairing or assisting in repairing engines, tracks, and bridges which were used in interstate commerce and never withdrawn from such use. We do not consider those authorities apposite here and are of the opinion that the decisions of the Supreme Court of the United States, which we have discussed, are pertinent and decisive of the issue presented.

■ The second issue presented is whether or not the plaintiff is totally and permanently disabled to do work of a reasonable character as a result of the accidental injuries. At the time of the accident, May 22, 1933, plaintiff was thirty-one years of age and had been employed as a manual laborer by the railroad company for more than fourteen years. At the time the heavy portable electric crane, which had the appearance of a large motortruck, collided with the coal car, it was being operated at a rapid rate of speed and plaintiff received crushing injuries of the body. There were lacerated muscles and blood vessels, which caused inward abdominal hemorrhages, necessitating an immediate operation in the left inguinal region. An X-ray picture taken about that time showed some injury to the spine and the fifth lumbar vertebra, consisting of both a break and a displacement. The patient was under treatment until December 8, 1933, when he was discharged from the company's hospital by its doctors, who admonished him not to attempt to do anything except light work, but the company did not provide him with such a job. In fact, he was not permitted to return to his usual work. This circumstance is significant, for, if the plaintiff had recovered as the com-

pany's doctors say, then there was no reason why he should not have been placed back on his job. Due to the fact that he had a wife and three small children dependent upon him for support, he was forced to secure employment elsewhere as a millwright laborer sharpening tools. He was employed in this capacity for about five months. On another occasion, he assisted in unloading merchandise contained in sacks weighing 100 pounds, there being two men to each bag. Plaintiff testified that he was in constant pain while working, but necessity compelled him to bear it until he could not stand it any longer.

When the plaintiff worked for the railway company, he was earning $5.28 per day. After his injuries, he earned $12 a week.

On the day of the accident, May 22, 1933, plaintiff weighed 140 pounds. At the time of the trial, December 4, 1934, he only weighed 118 pounds, and the district judge observed that he did not look well and was emaciated.

The medical testimony is in conflict and irreconcilible. The doctors who operated upon plaintiff and originally attended him testified in his behalf and stated that, as a result of the crushing body injuries sustained and the operation to repair the damage, plaintiff is incapable of doing laborious work without constant pain; that there was a curvature of the spinal column to the left about one-half inch, caused by the tilting of the fifth lumbar vertebra, indicating that there had been an injury to the sacrovertebræ articulation on that side.

The doctors who testified in behalf of the defendants, two of whom attended plaintiff when he was in the company's hospital at Palestine, Tex. (the patient having been permitted to leave the hospital at Lake Charles, where he was operated upon, and convalesce at home for a short period of time, and then ordered to go to the hospital at Palestine, Tex.), were of the opinion that the X-rays of the plaintiff's back did not show any pathological condition, and that the curvature of the spine shown therein was the result of plaintiff's position at the time the picture was taken. One of the experts confined his testimony to the absence of any apparent bone injury and refused to discuss cartilage and nerve damage. Another testified that the plaintiff, at the time he was discharged from the hospital at Palestine, Tex., was capable of doing light work. A third expert considered the plaintiff capable of doing strenuous work, stating that in his opinion the plaintiff was suffering from "compensation neuritis." However, when the district judge asked him if he meant to say that the plaintiff was a malingerer, the doctor stated that he would not like to make that assertion, because he could not prove it.

We are impressed with the frankness and candor of the plaintiff in giving his testimony. We are confident that a man who seriously and conscientiously attempted to comply with the doctors' orders and who worked while suffering to maintain his family had no intention of imposing upon the company; nor do we think that he should be penalized because he showed courage and patience in attempt-

ing to carry out the doctors' orders to do light work until he regained his strength.

In the settlement and release, which the defendants' representatives had the plaintiff sign on December 9, 1933, it is stated that the plaintiff was seriously, painfully, and permanently injured.

There is no doubt that the plaintiff suffered serious and painful injuries requiring a major operation to save his life. A careful reading of the medical testimony, even though it is in conflict, has left us with the definite conviction that the plaintiff is totally and permanently disabled and unable to perform work of any reasonable character.

There was no dispute that plaintiff would be entitled to the maximum of $20 per week compensation, if there is liability.

The final question presented is whether or not the plaintiff is entitled to additional compensation provided for by subsection 9 of section 8 of Act No. 242 of 1928 (page 362), amending paragraph 9 of section 8 of Act No. 85 of 1926, which amended Act No. 20 of 1914, since it is said that the settlement made by defendants with plaintiff was without the approval of the court and at a discount of more than 8 per cent.

The plaintiff was discharged from the hospital on December 8, 1933, and on December 9, 1933, while still there he signed a compromise settlement and release for the sum of $414.12, in full liquidation of his claim. It is admitted that this settlement or compromise was not approved by the court. Counsel for the defendants contend that it was unnecessary to have this done because the case fell under the Employers' Liability Act. Since we have concluded that counsel were in error in that respect and the case is covered by the Compensation Law of this state, it is necessary to determine, under the circumstances, whether or not defendants are liable for the additional compensation provided for in the statute.

The settlement and release reads, as follows:

"*Release in Full.* In consideration of the sum of Four Hundred Fourteen & 12/100 Dollars ($414.12), this day paid to the undersigned by L. W. Baldwin and Guy A. Thompson, Trustees, New Orleans, Texas & Mexico Ry. Co., Debtor, the undersigned has this day released and does hereby release said *Trustees and said* Company and associated lines (including all Railroad Companies, Trustees and Receivers operating trains or cars over any of the tracks of New Orleans, Texas & Mexico Railway Company, their Successors and Assigns) from all claims, demands and causes of action against them, or either or any of them, which have accrued or may hereafter accrue to the undersigned for all damages of every nature whatsoever, received in or resulting from an accident at or near DeQuincy, Louisiana, on or about May 22nd, 1933, in which I, *Fred B. Fluitt was injured while operating crane backed crane and was jammed between crane and corner of coal car, more or less seriously, painfully and permanently injuring him.*

"Said sum of money is accepted by the undersigned in *compromise and settlement*

of all damages, injuries and *disabilities, which may hereafter result from said accident,* or from any other accident or casualty occurring prior to the date of this release, as well as for those now known.

"It is expressly understood and agreed that said sum is paid and accepted not only for time and wages lost, expenses incurred and property damaged and destroyed, but also in full and final settlement of all claims of every nature, kind and description caused by the said or any other accident.

"In making this settlement I am not relying upon any statement made by any agent or physician of or representing said Trustees or Railway Company as to what my injuries are, or how serious they are, or when or to what extent I may recover therefrom.

"It is definitely understood that in making this settlement no promise or representation is or has been made relative to future employment.

"I have read the above and thoroughly understand the same.

"In Testimony Whereof, I have hereunto set my hand, this 9th day of December, 1933.

"Witness: [Sgd.] Fred B. Fluitt.
 "[Sgd.] Frank S. McDonough."

From the foregoing settlement and release in full, it appears that there was no dispute as to liability, amount of wages earned or compensation due, and it is expressly stated that the plaintiff was permanently injured. The fact that it is specifically stated that the company made no promise or representation as to future employment further shows that they considered this man was disabled and undesirable as a future employee. Their own doctors' testimony also shows that at that time the plaintiff was incapable of doing anything but "light work," which was not furnished him by the company. At the time of the settlement, plaintiff was entitled to at least 26 weeks' compensation at $20 per week, or $520, and he was only paid $414.12. Therefore the settlement was at a greater rate than 8 per cent. discount and was also never approved by the court.

Subsection 9 of section 8 of Act No. 242 of 1928 (page 362) provides:

"The amounts payable as compensation may be commuted to a lump sum settlement by agreement of the parties after having been approved by the Court as *reasonably complying with the provisions of this Act;* provided, that in making such lump sum settlement, the payments due the employee or his dependents, under this Act, shall not be discounted at a rate greater than eight per centum per annum; if such lump sum settlement be made without the approval of the Court, or at a discount greater than eight per centum per annum, even if approved by the court, the employer shall be liable for compensation at one and one-half times the rate fixed in this Act, and the employee or his dependents shall, at all times within two years after date of the payment of the lump settlement and notwithstanding any other provisions of this Act, be entitled to demand and receive in a lump sum from the employer such additional payment as together with the amount al-

ready paid will aggregate one and one-half times the compensation which would have been due under this Act, but for such lump sum settlement. But upon the payment of a lump sum settlement commuted on a term agreed upon by the parties, discounted at not more than eight per centum per annum and with the approval of the Court, the liability under this Act of the employer making such payment shall be fully satisfied; provided, that for injuries scheduled in paragraphs 1-d and 2 of this section, no shorter term than therein set forth have been agreed upon."

And section 17 of Act No. 20 of 1914 (amended by Act No. 38 of 1918) reads:

"The interested parties shall have the right to settle all matters of compensation between themselves. But all agreements of settlement shall be reduced to writing and *shall be substantially in accord with the various provisions of this act,* and shall be approved by the Court. The agreement between employer and employee or his dependent shall be presented to the Court upon joint petition of employer and employee or his dependent, which petition must be verified by both parties. The settlement so approved shall be immediately entered as the judgment of the Court, and such judgment shall have the same force and effect and may be satisfied as other judgments of the same court." (Italics ours.)

▆▆▆ In interpreting these two parts of the Compensation Law, this court has held that, where there is a serious dispute between the claimant and the employer and a substantial compromise settlement is made with the approval of the court, section 17 of the act governs, and the payment of the amount agreed upon satisfies the judgment of the court approving the compromise and binds the claimant. If there is no serious dispute between the parties and a settlement is made, or if the settlement is made without the approval of the court, or if made with the approval of the court at a greater rate of discount than 8 per cent., where there is no serious dispute, then it is a lump-sum settlement in violation of subsection 9 and the release does not protect the employer. Young v. Glynn, 171 La. 371, 131 So. 51, and Musick v. Central Carbon Co., 166 La. 355, 117 So. 277.

The settlement made with the plaintiff and relied upon by him for the imposition of the additional compensation provided by subsection 9 of section 8 of Act No. 242 of 1928 (page 362) is certainly not such a compromise settlement as is provided for in section 17 of Act No. 20 of 1914, for these reasons:

(A) There is no dispute set out in this agreement between the plaintiff and the defendant, either as to (1) whether the injury is compensable, or (2) as to the rate of compensation, or (3) as to the duration of disability—in fact, no dispute of any kind.

(B) It is not in the form of an agreement of settlement reduced to writing, signed by both parties and presented to the court upon the joint, verified petition of employer and employee, and approved by and made the judgment of a court.

In fact, it is nothing more nor less than a settlement by the payment to the plain-

tiff in a lump sum or amount for whatever disabilities he may have sustained as a result of the accident.

 Not being a compromise settlement under section 17, and being a settlement in a lump sum or amount, it is bound to be such a lump-sum settlement as is contemplated by subsection 9 of section 8 of ·Act No. 242 of 1928 (page 362). Consequently, having been made without the approval of a court and at a discount of more than 8 per cent., the defendants are liable for the additional compensation provided by the mandatory provisions of said subsection 9. This conclusion is supported by the case of Taylor v. Lock, Moore & Co., Ltd., 164 La. 577, 578, 114 So. 163, where the plaintiff secured additional compensation under circumstances not as aggravated as the present case.

For the reasons assigned, the writ of certiorari is perpetuated and the judgments of the Court of Appeal and the district court are annulled and set aside, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of Fred B. Fluitt, plaintiff, and against the defendants, Guy A. Thompson and L. W. Baldwin, trustees of the New Orleans, Texas & Mexico Railway Company, awarding the plaintiff, Fred B. Fluitt, compensation at the rate of $30 per week for 400 weeks, beginning May 22, 1933, with interest upon each past-due installment from its due date until paid; the whole payable in a lump sum and subject to a credit of $414.12; defendants to pay all costs of court.

· FOURNET, J., recused.