LOTTINGER, Judge.
Petitioner John F. Wascom, now deceased, brought this suit under Louisiana Workmen’s Compensation Act claiming total disability benefits for an injury to hiis right foot, and for penalties for an attempted consummation of an illegal lump sum settlement. The defendant is Dewey Miller, doing business as Miller Lumber Company, for whom petitioner was working at the time of the alleged accident. The Lower Court rendered judgment in favor of petitioner for compensation at the rate of $28.60 per week for a period of 125 weeks, less compensation which has already been paid. Both parties appealed, petitioner seeking an increase in the number of weeks and penalties, and defendant seeking a dismissal of the suit. The record shows, and it is agreed by the parties, that petitioner suffered an injury on August 9, 1949, to his right foot, at which time he was employed as a planer machine operator by the defend *746 ant. It is stipulated that this is hazardous work within the meaning of the Compensation Act. It is further stipulated that petitioner received treatment from the Medical Center at Bogalusa, Louisiana, for the injury, however, he was not confined to the hospital. He further received treatment at the Charity Hospital in New Orleans.
Petitioner has received as compensation the sum of $635, the last payment thereon being made on January 7, 1950, at which time petitioner received a check for $205 in return for which he signed a statement acknowledging receipt of the sum of $630 “ * * * being in full and final, complete and entire satisfaction of all claims and demand of every kind, character, nature and description * * * ” arising from the said accident. It is stipulated that on or about January 7, 1950, petitioner returned to work for 'Miller Lumber Company, where he continued in his same job and for the same wages until March 7, 1950.
The record discloses that on November 8, 1950, petitioner went to work for Magazine Lumber Company, doing the same type of work for a period of 10 weeks, or until January 16, 1951. The petitioner did not work and claims that he has been unable to work since January 16, 1951. Judgment was rendered by the Lower Court on June 25, 1957.
Since this appeal has been lodged in this Court, the petitioner died on November 6, 1957, and his widow and children are seeking to be substituted as petitioners herein. The motion and order which has been filed is accompanied with an affidavit of death and heirship and a certified copy of a judgment of possession rendered by the Twenty-second Judicial District Court of the Parish of Washington, State of Louisiana in the matter entitled Succession of John F. Was-com bearing No. 2699 of the docket of said court wherein Mrs. Annie Crawford, widow of John F. Wascom, was recognized as the surviving spouse in community of the deceased and entitled as such to be sent into possession of one-half of all the property left by the decedent in her own right and that Cleo Wascom, wife of Orval Odom, Gladys Wascom, wife of Leo Willis and John F. Wascom, Jr., were recognized as the sole surviving children and legal heirs of the decedent and entitled as such to the remaining one-half of the property left by said decedent.
Actually, there are four questions presented before this Court, as follows:
(1) Can the widow and heirs be substituted as petitioners in lieu of their deceased husband and father ?
(2) Was the agreement signed by petitioner on January 7, 1950, an attempted lump-sum settlement, so as to bring into effect the penalties as provided for in LSA-R.S. 23:1274?
(3) Has prescription for the filing of this suit accrued ?
(4)Is the injury to petitioner compensa-ble under the Workmen’s Compensation Act, and if so, to what extent?
As to the first question, whether or not the widow and heirs may be substituted in place of the deceased petitioner, we feel that the answer should be “Yes”, as any payments which had accrued had already accrued at the time of death. However, they may not be substituted as to any future payments to become due. In Guillot v. Weaver Bros. & Thompson Lumber Company, La.App., 31 So.2d 278, 279, the Court said:
“At plaintiff’s death the benefits accruing to him under the Workmen’s Compensation Law ceased. These benefits were personal to him as a disabled workman and after his death payments that had not accrued were not heritable. The interest of his heirs and legal representative is limited to the amount of payments that had accrued and had not been paid at the time of his death.”
*747 The same line of reasoning was held in Warren v. Globe Indemnity Company, 216 La. 107, 43 So.2d 234, as well as other cases.
The accident occurred on August 9, 1949. The petitioner died on November 6, 1957. Even though we were to hold that the defendant is liable for compensation for a period of 400 weeks, the said 400 weeks would have accrued prior to his death, and the entire amount would be heritable by his legal heirs as a part of his estate.
Therefore for the above and foregoing reasons the surviving widow and children of the decedent are hereby substituted for' the decedent John F. Wascom herein.
The second question presented above is whether or not the agreement entered into by the parties on January 7, 1950, without court approval, was an attempted lump-sum settlement, and if so, do the penalties as provided for in LSA-R.S. 23:1274 apply.
LSA-R.S. 23:1274 provides as follows:
“The amounts payable as compensation may be commuted to a lump sum settlement by agreement of the parties after having been approved by the court as reasonably complying with the provisions of this Chapter provided, that in making such lump sum settlement, the payments due the employee or his dependents, shall not be discounted at a greater rate than eight per centum per annum.
“If the lump sum settlement is made without the approval of the court, or at a discount greater than eight per centum per annum, even if approved by the court, the employer shall be liable for compensation at one and one-half times the rate fixed by this Chapter and the claimant shall, at all times within two years after date of the payment of the lump sum settlement and notwithstanding any other provisions of this Chapter, be entitled to demand and receive in a lump sum from the employer such additional payment as together with the amount already paid will aggregate one and one-half times the compensation which would have been due but for such lump sum settlement.But upon the payment of a lump sum settlement commuted on a term agreed upon by the parties, discounted at not more than eight per centum per annum and with the approval of the court, the liability of the employer making such payment shall be fully satisfied; provided, that for injuries scheduled in subdivision (4) of R.S. 23:1221 and in R.S. 23:1231 through 23:1236 no shorter term than that therein set forth shall be agreed upon.” (Italics ours.)
It is our appreciation of the law that both lump sum settlement and compromise must receive court approval and both must comply strictly with the requirement of the statute. If court approval is not secured as required by the act the agreement will be regarded as a lump sum settlement made without court approval and the employer will be subjected to suit for additional compensation and penalty.
In Fluitt v. New Orleans, T. & M. Ry. Co., 187 La. 87, 174 So. 163, 174, the Court said:
“In interpreting these two parts of the Compensation Law, this court has held that, where there is a serious dispute between the claimant and the employer and a substantial compromise settlement is made with the approval of the court, section 17 of the act governs, and the payment of the amount agreed upon satisfies the judgment of the court approving the compromise and binds the claimant. If there is no serious dispute between the parties and a settlement is made, or if the settlement is made without the approval of the cotcrt, or if made with the approval of the court at a greater rate of discount than 8 per cent., where there is no serious dispute, then it is a lump-sum settlement in violation of subsection 9 and the release does *748 not protect the employer. Young v. Glynn, 171 La. 371, 131 So. 51, and Musick v. Central Carbon Co., 166 La. 355, 117 So. 277. (Italics ours.)
“The settlement made with the plaintiff and relied upon by him for the imposition of the additional compensation provided by subsection 9 of section 8 of Act No. 242 of 1928 (page 362) is certainly not such a compromise settlement as - is provided for in section 17 of Act No. 20 of 1914, for these reasons:
“(A) There is no dispute set out in this agreement between the plaintiff and the defendant, either as to (1) whether the injury is compensable, or (2) as to the rate of compensation, or (3) as to the duration of disability — in fact, no dispute of any kind.
“(B) It is not in the form of an agreement of settlement reduced to writing, signed by both parties and presented to the court upon the joint, verified petition of employer and employee, and approved by and made the judgment of a court.
“In fact, it is nothing more nor less than a settlement by the payment to the plaintiff in a lump sum or amount for whatever disabilities he may have sustained as a result of the accident.
“Not being a compromise settlement under section 17, and being a settlement in a lump sum or amount, it is bound to be such a lump-sum settlement as is contemplated by subsection 9 of section 8 of Act No. 242 of 1928 (page 362). Consequently, having been made without the approval of a court and at a discount of more than 8 per cent., the defendants are liable for the additional compensation provided by the mandatory provisions of said subsection 9. This conclusion is supported by the case of Taylor v. Lock, Moore & Co., Ltd., 164 La. 577, 578, 114 So. 163, where the plaintiff secured additional compensation under circumstances not as aggravated as the present case.”
Despite the mandatory provision for the penalty under LSA-R.S. 23:1274 the courts have seen fit on several occasions not to award same.
In Fontenot v. Goldenstern Pipe & Supply Co., 50 So.2d 484, we followed the reasoning of the Fluitt case but held that there was no fraud involved by the employer in securing the lump-sum settlement and that, therefore, as both parties were in good faith, the penalities did not apply. Puchner v. Employer’s Liability Assurance Corporation, 198 La. 921, 5 So. 2d 288. The same line of reasoning was followed in Brown v. J. B. McCrary Co. 10 La.App. 499, 119 So. 731, 732, wherein the Court said:
“The evident purpose of the lawmaker in providing that, under some circumstances, the defendant may be required to pay an injured employee or his dependents one and one-half times the amount actually due him, was to prevent unscrupulous employers from imposing upon their ignorant laborers. Certainly it was never intended that the law should work a hardship upon honest employers who deal fairly and justly with their employees. In the case at bar, the record satisfies us that there was no fraud practiced upon the plaintiff by the defendants, or any of their agents or employees, and that there was no attempt to take any unfair advantage of him.”
In the case at bar there was no attempted fraud by this employer. The parties were not even represented by counsel and an employee of defendant in defendant’s office drew up the release as hereinabove referred to; because the claimant had demanded the amount of compensation due him.
Therefore, under the jurisprudence of this state, as there was no dispute set *749 forth in the agreement entered into between the parties, and as the said agreement was not approved by the Court, the said agreement is an attempted lump-sum settlement. However, as the said agreement was entered into by the parties in good faith, and no fraud was shown on the part of the employer, the penalties will not apply.
We feel that the question of prescription as presented by the defendant is without merit. Under the provisions of LSA-R.S. 23:1274 prescription does not accrue until two years after the date of the attempted lump sum settlement. Said settlement as stipulated by the parties was dated January 7, 1950. Therefore, under the provisions of the Workmen’s Compensation Act, prescription would not accrue until January, 1952. Pope v. Employers Liability Assurance Corp., La.App., 14 So. 2d 105. Suit in the case at bar was filed on January 10, 1951. It is therefore the opinion of this Court that this suit was timely filed and that prescription had not accrued.
We next come to the question of disability, if any, suffered by the petitioner. The record shows that on January 7, 1950, the petitioner returned to work for the defendant and continued in his same employment until on or about March 7, 1950. At that time, according to petitioner’s testimony, he was discharged. The defendant claims, however, that the petitioner was not discharged, but that he quit working. Subsequently, on June 7, 1950, petitioner went to work for Magazine Lumber Company on a similar job where he remained for a period of 13 weeks until September 5, 1950. We therefore find the petitioner returning to the same type of work some five months after the accident, where he remained for a period of some 8i/i weeks. He then remained unemployed for a period of 3 months and then went to work again for a period of about 13 weeks for Magazine Lumber Company in the same type of job.
Petitioner claims however that all during the time he worked subsequent to his accident he did so with substantial pain and discomfort in order to support his family. He contends that he was forced to wear a rubber hose or sock to prevent the foot and ankle from swelling, but that despite this, it would swell and produce severe pain and discomfort while attempting to carry on his work. In this he was corroborated by his wife. His wife testified that his foot would swell and that he walked crippled all the time. It was further stipulated that if Mrs. Gladys Willis, Mrs. Mildred Hodges and John F. Was-com, Jr., were placed on the stand, their testimony would be substantially the same as that of plaintiff’s wife.
As to the medical testimony, Dr. Blaise Salatich, an orthopedic specialist, in New Orleans, testified that petitioner sustained a crushing injury to his right foot. Dr. Salatich examined the petitioner in December, 1951, and again on January 21, 1957, which was just a short time before the trial. We further quote his testimony as follows:
“A. I found he was unable to squat normally due to limitation of motion in the right ankle and foot. He was able to stand on the toes of the left foot bearing full body weight with no apparent difficulty or pain, but upon standing on the toes of the right foot bearing full body weight, due to weakness and limitation of motion in his right ankle and foot, he appeared to walk with some apparent limp, favoring the right ankle and foot.
“Q. Were you satisfied that limp was genuine and not just put on? A. Yes sir, I considered his limp to be apparently well founded in view of what I had found and the given history as to what had happened to him. At that time request for X-rays were made to Drs. Fortier, Hunt & Brierre, Radiologists, #700 Audubon Building, they revealed an old healed fracture *750 of the distal end of the shaft of the second metatarsal bone; there were marked hypertrophic arterial changes or hypertrophic arthritis present in the tarsal bones.
“Q. Would arthritis ordinarily result from that type fracture, particular with a man of Mr. Wascom’s age? A. Trauma of that type is worse I would say, for the force exerted on that foot unquestionably contributes to the development of arthritis, and especially in an individual of his age, and aside from that, if the injury is immobilized, in a man of his age, it also makes for a loss of the use in the sense that your limb is immobilized for a long period of time, and it is rather difficult to get the same functioning again in that member.
“Q. Because of a man’s age? A. Yes, there is almost a direct possibility between the length of time of the immobilization of a member, and the age, including the type of trauma as sustained — and in this case all three factors contribute to the disfunctioning.
“Q. Your findings at that time were in line with what was to be expected in view of the type injury he had received and his age, is that right? A. That is right.
“Q. With these findings what was your opinion as to this man’s disability, in view of the type work which he had described he was required to do? A. I thought this individual had sustained a rather painful and to some degree disabling injury of his right ankle and foot on August 9, 1949, when sufficient crushing type trauma was sustained to result in the injury of bone and soft tissue structures that was previously described. I thought although a rather long period of time had elapsed since the onset of these injuries, this patient presented at the time of my examination sufficient positive subjective and
objective physical findings, substantiated by radiographic survey, to warrant his present complaints of rather constant, severe, deepseated, aching-type pain, localized in the lower portion of his right leg, ankle and foot, associated with swelling following physical activities, including marked limitation of motion in his right ankle and foot, as compared to the opposite side. I thought he must be considered at that time to be unable to carry on any physical acitivities of any undue or strenuous nature which would impose on his right lower extremity, with specific emplrysis on the ankle and foot, and that considering the long period of time that had elapsed since the onset of this injury, that is approximately two and one half years, together with the physical findings noted at the time of this examination, and especially in view of the marked hypertrophic arthritic changes demonstrated in all of the torsal joints of the right foot, that the future prognosis in this case should be kept fairly well guarded, and on this basis the residual disability presented at the time of this examination was considered to be of a permanent nature.
“Q. Would you say a man with the subjective and objective findings which you had found would be in a position to go out in the labor market and do a hard day’s work at hard physical labor which required him to stand and pick up objects and work a full eight-hour day under these circumstances? A. No, this man presented sufficient persisting clinical findings, including subjective and objective complaints, to warrant his being unable to carry on sustained effort; he might be able to do it for two or three hours, he might be able to do it for a day, but as for doing it eight hours a day, five days a week, he would be unable to do that in the type work he would be called upon to do.
*751 “Q. Could you tell us about what percentage of disability existed at that time in the functioning of the foot as a result of your findings? A. I would say it would be approximately fifty percent.
“Q. With this type injury would you say exercise would tend to improve the condition if there was going to be any improvement? A. I have always contended that nature and time is the best proof of improvement, and if a convincingly long period of time has elapsed and nature has been given full opportunity and with treatment of the injury with plaster cast, ace bandages, correctives, etc. that after a sufficiently convincingly long period of time, one would be asking the impossible if they would say it would improve — even with exercise it would improve a minimal degree.
“Q. However, ordinarily, in fracture cases one of the important elements of treatment is exercise and use of the member after the immobilization period, is that right? A. Yes, one tries to rehabilitate the patient as fast as they can within the limits of normal functional activities.
“Q. If this man went back to work and worked after the injury, and worked for a period of say a year, during that time should there have been some improvement with normal, or relatively normal use of the member? A. Let’s say if he had returned to work for a period of a year that would be a convincingly long enough period of time and if he returned to work unquestionably he had to use it, so both qualifications for improvement have been fulfilled in this case; a year of work, and the physical activities of work and the exercise of work, if that didn’t improve him, I don’t know of anything that would.
“Q. You have had occasion to examine Mr. Wascom recently, that was on last Monday? A. Yes, sir, I examined Mr. Wascom on January 21, 1957.
“Q. Generally, did you find very much difference in' your findings at that time than the findings in your original examination? A. Not as far as the right ankle and foot were concerned, the right ankle and foot presented approximately the same findings, the change in the findings were the variations of the right thigh — the right thigh upon the 1951 examination was 21/z inches smaller than the left, and at the time of the last examination recently the right thigh was approximately ¿4 to one inch smaller than the left as compared to 214 inches in 1951, hut his left ankle and his left midfoot was approximately % inches larger than the right by comparison. He was still unable to squat and unable to stand on his toes, was tender in approximately the same area to the same degree.
“Q. Would you say then from the time of your original examination until the present time there has been no real improvement in the condition of the foot? A. Not physically I would say from an objective standpoint there has been no real improvement in the foot, and since the man consistently complains over a six-year period of time that his foot still swells and his foot still hurts, and he stilly cannot walk normally on it, you have got to say it must be considered to be worse subjectively and not convincingly improved objectively. *
“Q. Would your opinion at the present time be the same as to his disability that it was in 1951? A. Yes, I advised in 1951, due to the series of events having occurred in this case as to the injury and the amount of time elapsed — we saw him first in 1951' — that a guarded prognosis should have been maintained. In 1951 he was unable to go back to work and stand *752 for any period of time' and continue to work efficiently, and I think the period of time and events that have occurred have borne out rather conclusively this opinion — in other words, time has proven my opinion was correct in 1951.”
A letter by Dr. Schlesigner, who had died prior to the trial, showed that X-rays disclosed a fracture of the second metatarsal of the foot, with good healing. Another letter by Dr. H. L. Morgan actually added nothing to the evidence.
Since the plaintiff at the time of the accident had been engaged in an occupation which involved being on his feet all day long and walking around and standing, it is apparent that he is disabled from carrying on the same or similar description, kind or character of work when injured as we find from the medical testimony that this claimant experiences substantial pain and discomfort in standing or walking while performing his work. Of course the law does not require anyone to work under conditions of substantial pain. The Lower Court did not render written reasons herein, but since it awarded 125 weeks compensation, we can assume that it awarded for the loss of a foot whereas we are of the opinion that plaintiff is entitled to permanent total disability. See Fontenot v. Goldenstern Pipe & Supply Co., La.App., 50 So.2d 484.
Therefore, for the reasons hereinabove assigned, there will be judgment herein substituting as petitioners herein, the decedent’s wi,dow and heirs, namely, Annie Crawford Wascom, Widow, Cleo Wascom, wife of Orval Odom, Gladys Wascom, wife of Leo Willis and John F. Wascom, Jr. The judgment of the Lower Court will be further amended by- awarding to petitioners herein compensation at the rate of $28.60 per week for a period of 400 weeks beginning on August 9, 1949, with legal interest from the date of maturity of each weekly payment until paid less a credit of $635 for compensation already paid and subject to a further credit of 8weeks compensation being the period the deceased worked for defendant and received wages in lieu of compensation.
That the judgment of the Lower Court will be amended as herein stated and, as amended, same will be affirmed, all cost will be paid by defendant.
Judgment amended and as amended affirmed.